UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

IZARIAH JUMP, and
ESTATE OF JONAH MARCINIAK,
by special Administrator, Brenda Mroch,

       Plaintiffs,                    Case No.:     19-CV-1151

v.

VILLAGE OF SHOREWOOD,
THOMAS LIEBENTHAL,
CODY J. SMITH, and,
NICOLAS TARABOI,

       Defendants.

---

## DEFENDANTS' SUMMARY JUDGMENT BRIEF

---

      The defendants, Village of Shorewood, Thomas Liebenthal, Cody J. Smith, and, Nicolas Taraboi (collectively, "Defendants"), by their attorneys, Schmidt & Wirth Law Offices, hereby submit this summary judgment brief in accordance with F.R.C.P. 56 and Civil L.R. 56.

### **PREFACE**

      This lawsuit arises out of the arrest and subsequent suicide of Jonah Marciniak ("Marciniak") on the early morning of August 15, 2016. Plaintiffs sued Village of Shorewood and three Village police officers under 42 U.S.C. §1983 and Wisconsin's wrongful death statutes. Plaintiffs allege unlawful arrest and detention, illegal search and seizure, violation of due process, denial of medical attention, and state law wrongful death with respondeat superior.

      The defendants deny all allegations of wrongful conduct, deny liability to the plaintiffs, and also assert qualified immunity against the plaintiffs' claims. Accordingly, the defendants move for the dismissal of the plaintiffs' lawsuit in its entirety.

The motion for summary judgment is supported by this legal memorandum, the declarations of Thomas Liebenthal ("Liebenthal"), Cody J. Smith ("Sgt. Smith"), Nicolas Taraboi ("Taraboi"), Andrew Rekuski ("Rekuski"), Attorney Amanda Melrood, and Attorney Joseph M. Wirth, as well as the defendants' Proposed Findings of Fact.

## **FACTUAL BACKGROUND**

The facts relevant to the defendants' motion for summary judgment are set forth in the "Defendants' Proposed Findings of Undisputed Facts" ("DPFF"). Below is a brief summary of those facts as an introduction to the legal arguments that follow.

Jonah Marciniak ("Marciniak") was arrested by officers of the Shorewood Police Department ("SPD") who responded to an emergency call involving significant injuries to Eric Harper ("Harper"), who had fallen from the fourth story window of the apartment he shared with Marciniak. (DPFF No. 10-13, 18, 47-48). Upon the officers' arrival, Harper was found on the ground below the open window, badly injured, semi-conscious and incoherent. (DPFF No. 13).

On August 15, 2016, SPD Sergeant Cody Smith ("Sgt. Smith"), along with Officer Cody Smith ("Off. Smith"), were among the responding officers to an apartment building located at 4422 North Oakland Avenue in Shorewood, Wisconsin.[1] (DPFF No. 10-11). After gaining access to the apartment building, and having the North Shore Fire Department ("NFSD") force entry into Harper's apartment, Sgt. Smith removed Marciniak from the apartment and ordered him handcuffed and transported to the Village of Shorewood lock-up to conduct additional investigation into the circumstances of Harper's fall. (DPFF No. 17, 23-24, 45-49). Officer Nicholas Taraboi ("Taraboi") transported Marciniak to the lock-up. (DPFF No. 49). Lieutenant

---

[1] Coincidentally, and sometimes confusingly, the Village of Shorewood Police Department had two officers named Cody J. Smith, both of whom responded to the apartment building for the emergency call. They are distinguished in this brief as "Sgt. Smith" and "Off. Smith." Only Sgt. Smith is a defendant in this lawsuit.

Thomas Liebenthal ("Liebenthal"), who was neither present at the scene nor the jail, was contacted by telephone for direction on the arrest and investigation. (DPFF No. 41-44, 82).

Police determined that the window from which Harper fell was in Apartment 10. (DPFF No. 16). Officers knew that Marciniak had also lived in that apartment, and that he had suffered a heroin overdose on the premises three days earlier. (DPFF No. 18). Officers also knew that SPD had responded to a domestic disturbance call at the same apartment, involving Harper and Marciniak, a few weeks earlier. (DPFF No. 19). Responding officers were allowed entry into the building, and thereafter went upstairs to Apartment 10. (DPFF No. 17). After repeated knocking, bell ringing, and announcements of police presence went unanswered, Sgt. Smith exercised his community caretaker functions and asked NSFD personnel to force entry into the apartment to check on the wellbeing of any occupants, including Marciniak. (DPFF No. 22-24).

Sgt. Smith, Off. Smith and Taraboi entered Apartment 10. (DPFF No. 25). They found Marciniak in a back bedroom, unconscious and naked on the bed near the open window from which Harper had fallen. (DPFF No. 26). He was eventually roused and evaluated by NSFD EMTs and paramedics. (DPFF No. 29). NSFD assessed Marciniak and checked his vitals, noting that he was groggy, but not agitated or distraught, and did not make any suicidal statements. (DPFF No. 29). Marciniak refused medical treatment from NSFD and refused transport to the hospital. (DPFF No. 30). Because he was appropriately answering the questions that NSFD used to determine competence to refuse medical transport, NSFD released Marciniak to the SPD. (DPFF No. 32-33). Taraboi gave Marciniak clothing and underwear found in a bedroom dresser, but Marciniak put on only the shirt and pair of shorts that he was given. (DPFF No. 35).

The officers observed that the bedroom looked like there had been a physical altercation: the bed was pushed askew on its frame, there were two broken drinking glasses, broken glass and

spots of blood on the bed, spots of blood on a piece of mail next to the open window, and a removed window screen. (DPFF No. 37-40). Sgt. Smith called Liebenthal to apprise him of the situation, including the state of the bedroom and Harper's condition. (DPFF No. 41).

Based on evidence of a physical altercation in the bedroom, the fact that Harper and Marciniak were current or former roommates, Harper's fall from the window and severe injuries, a neighbor having heard (and captured on her cell phone) Harper yelling for help, Marciniak's proximity to the window, the relative lack of injuries to Marciniak and his apparent intoxication, a piece of glass on Marciniak's back, blood spots, neighbors' reports that Harper and Marciniak had previously had loud altercations, and the SPD's response to a prior domestic disturbance call between Harper and Marciniak, the SPD officers arrested Marciniak under Wisconsin's domestic abuse statute. (DPFF No. 45-47). Officers determined they had probable cause for the arrest and were considering charges including battery all the way up to possible attempted homicide or homicide, depending on whether Harper survived his injuries. (DPFF No. 45-48).

Liebenthal advised Sgt. Smith to detain Marciniak and transport him to the SPD station to be interviewed by a detective. (DPFF No. 44). Sgt. Smith removed Marciniak from the apartment building and directed Taraboi to arrest and transport Marciniak to SPD lockup. (DPFF No. 49). Sgt. Smith placed a request for assistance to the neighboring University of Wisconsin-Milwaukee ("UWM") police department, and asked that UWM send officers to assist Taraboi as he searched Marciniak at the station. (DPFF No. 57).

Upon arrival at the SPD sally port, Taraboi was met by UWM Officer Kyle Gerasch ("Gerasch"), and both officers accompanied Marciniak from the vehicle to an interview room inside the SPD station. (DPFF No. 58). A second UWM Officer, Sara Lagerman (n.k.a. Sara Heim) followed a short distance behind. (DPFF No. 58). As Marciniak exited the squad car for

the short walk into the station, the shorts that he had put on slipped down a bit, briefly exposing the top of his buttocks and the upper part of his pelvis area. (DPFF No. 59-60). Consequently, Taraboi held up the waistband of Marciniak's shorts for the rest of the walk to the interview room. (DPFF No. 61). Neither of the UWM officers saw Marciniak's genitals, pubic area, buttocks and/or anus. (DPFF No. 62). Once in the interview room, Taraboi performed a custodial pat-down search lasting 3 to 4 minutes. (DPFF No. 65). Marciniak's shorts did not fall down during the search. (DPFF No. 69).

When the search was completed, Sgt. Smith and Taraboi placed Marciniak in one of the municipal lockup cells and filled out a booking sheet, with each officer asking Marciniak some of the health screening questions on the form. (DPFF No. 70, 73). On Marciniak's health screening form, affirmative checkmarks were placed in the boxes to indicate that Marciniak appeared to be under the influence of alcohol and drugs and to indicate that Marciniak had prior psychiatric treatment. (DPFF No. 77). Marciniak denied being sick, injured, on any prescription medication, under the current care of a doctor, or having been hospitalized in the past year. (DPFF No. 79). Marciniak told Taraboi and Sgt. Smith that he was not suicidal. (DPFF No. 80).

Sgt. Smith performed visual welfare checks at 2:54 a.m., 3:12 a.m., 3:16 a.m., 3:23 a.m., 3:33 a.m., and 4:19 a.m. (DPFF No. 93). *All* of Sgt. Smith's welfare checks on Marciniak were in accord with the "once per hour" state law enforcement standards. (DPFF No. 94). During the 4:19 a.m. visual check, Sgt. Smith found Marciniak hanging in his cell, having fashioned a noose from his t-shirt collar. (DPFF No. 95). Sgt. Smith immediately radioed for help, opened the cell, cut Marciniak down, and within minutes CPR was being performed and NFSD paramedics (who shared the building with the SPD) were providing medical aid. (DPFF No. 96). Marciniak was transported to the hospital where he died several days later on August 21, 2016. (DPFF No. 97).

5

Plaintiffs argue that SPD knew or should have known that Marciniak was a suicide risk. Their claim appears to rely upon a police interview of Harper that occurred two days before Marciniak's August 15 arrest. On August 13, 2016, SPD Officer Andrew Rekuski ("Rekuski") had interviewed Harper, after Harper contacted the SPD with information he believed related to Marciniak's heroin overdose on August 12. (DPFF No. 103-105). In that interview, Harper told Rekuski that Marciniak had several mental illnesses including depression and had attempted suicide in the past. (DPFF No. 106). However, notwithstanding the date of the interview, Rekuski's work schedule did not produce the written and filed report until two days after Marciniak had already hanged himself. (DPFF No. 103, 109-112).

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. F.R.C.P. 56. The summary judgment procedure is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 206 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

On a defendant's motion for summary judgment, it is not sufficient for the plaintiff, who bears the ultimate burden of proof at trial, to assert that a jury may disbelieve the defendant. *McCann v. Badger Mining Corp.*, 965 F.3d 578, 592 (7th Cir. 2020). Nor does a possible issue of fact prevent summary judgment. *King v. Hendricks Cty. Commissioners*, 954 F.3d 981, 985 (7th Cir. 2020). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for the jury to return a verdict for that party; if the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Rule 56(c) requires entry of summary judgment if the non-moving party fails to come forth with evidence to refute the moving party's allegations in its motion for summary judgment. *Celotex*, 477 U.S. at 322-24.

**ARGUMENT**

**I.    SPD OFFICERS HAD PROBABLE CAUSE FOR THE ARREST AND DETENTION OF MARCINIAK.**

SPD officers, responding to Harper's fall from a window of the fourth story apartment he shared with Marciniak, had clear probable cause to arrest Marciniak under Wisconsin's domestic abuse statute, Wis. Stat. § 968.075. Plaintiffs' likely argument on "exculpatory" evidence does not negate probable cause. Plaintiffs' claim that defendants falsely arrested and/or unlawfully detained Marciniak must be dismissed upon the merits. (Dkt. 1, Complaint, ¶¶ 118-121).

**a.  Federal Probable Cause Standard**

Probable cause is an absolute defense to a claim for false arrest or unlawful detention under § 1983. *Ewell v. Toney,* 853 F.3d 911, 919 (7th Cir. 2017). Probable cause exists if the totality of the facts and circumstances within the arresting officer's knowledge at the time would lead an objectively reasonable police officer to believe that the suspect has committed, or is committing, an offense. *United States v. Eymann*, 962 F.3d 273, 286 (7th Cir. 2020) (citations omitted). Lawful arrest is supported by probable cause that the suspect committed **any crime**, regardless of which crime the officer thought was at issue. *Abbott v. Sangamon Cty., Ill*., 705 F.3d 706, 715 (7th Cir. 2013)(citations omitted).

"[I]t does not take much to establish probable cause" because officers do not need such evidence to support a conviction or show that their belief is more likely true than false. *Ebert v. Gaetz*, 610 F.3d 404, 413 (7th Cir. 2010)(*quoting Fox v. Hayes*, 600 F.3d 819, 833 (7th Cir. 2010)). "Probable cause does not require legal certainty" or that all the facts point in only one

direction. *Zappa v. Gonzalez*, 819 F.3d 1002, 1005 (7th Cir. 2016). Probable cause exists when "the inference of illegal conduct by trained and experienced officers is at least as probable as any innocent inference." *United States v. Funches*, 327 F.3d 582, 587 (7th Cir. 2003).

### b. <u>Marciniak's Arrest Was Supported by Probable Cause</u>

Having found Harper lying badly injured beneath an easily identified fourth story window, Sgt. Smith ordered entry into the apartment "out of concern for the safety of anyone who might be inside[.]" (DPFF No., 13, 16, 23; Dkt. 1, Complaint, ¶ 22). He knew that Harper had fallen from a window and was seriously injured, Marciniak lived in the same apartment, SPD responded to Marciniak's heroin overdose at the residence days earlier, neighbors said Harper and Marciniak previously had loud altercations, and SPD also responded to a domestic disturbance call between Harper and Marciniak just weeks before. (DPFF No., 10, 13, 16, 18-21; Dkt. 1, Complaint, ¶ 21). Concerned for the welfare of anyone else inside the apartment, SPD officers loudly knocked, rang the buzzer, and shouted their presence in the hallway, but received no response. (DPFF No. 22-23; Dkt. 1, Complaint, ¶¶ 23-25). Under those circumstances, Sgt. Smith had an objectively reasonable concern that apartment occupants, potentially including Marciniak, may be injured or incapacitated as a result of an altercation or perhaps another drug overdose. (DPFF No. 18-23). Sgt. Smith reasonably believed that apartment occupants may need emergency aid or protection. (DPFF No. 18-23). Defendants were therefore permitted to enter the apartment. *United States v. Tepiew*, 859 F.3d 452, 456 (7th Cir. 2017).

Upon entry to the apartment, officers' discovery of Marciniak and the state of the bedroom led police to believe, in addition to the circumstances just described, that some form of struggle or altercation had occurred in the same room as the window from which Harper fell, giving them probable cause to arrest Marciniak on suspicion of domestic abuse. (DPFF No. 18-

21, 26-28, 31, 37-40, 45-48). Wis. Stat. § 968.075 applies to adults who currently reside or formerly resided together, and defines "domestic abuse" in part as the intentional infliction of physical pain or physical injury; or a physical act that may cause the other person reasonably to fear imminent engagement in that conduct. Wis. Stat. § 968.075(1)(a). Officers are required to arrest someone if there are "reasonable grounds to believe that the person is committing or has committed domestic abuse and that the person's actions constitute the commission of a crime" and there is evidence of physical injury to the alleged victim, or the suspect is the predominant aggressor. Wis. Stat. §§ 968.07(1m), 968.075(2)(a)1.

Defendants collectively made the decision to arrest Marciniak based on the following facts: Harper and Marciniak currently or formerly lived together; SPD responded to a domestic disturbance between Marciniak and Harper a few weeks prior; Harper fell from a fourth-story window and was severely injured; Marciniak was intoxicated, found near the window that Harper fell from, and not apparently injured; a neighbor heard Harper yelling for help; neighbors' reports that Harper and Marciniak had previously had loud altercations; evidence of a physical altercation in the bedroom, including two broken drinking glasses, the bed askew from its bedframe, a piece of glass on Marciniak's back, drops of blood on the bed, a removed window screen, and blood on a piece of mail near the window from which Harper fell. (DPFF No. 45). Harper was badly injured, conscious, but largely incoherent, and SPD officers and responding NSFD personnel concluded that he could not be interviewed at the scene. (DPFF No. 14).

Based on the facts Sgt. Smith relayed to Liebenthal, it was decided that Marciniak be arrested and brought to the SPD station to be interviewed by a detective. (DPFF No. 41, 44). Officers testified that, in addition to domestic abuse, potential charges included battery, reckless endangerment, and attempted homicide or homicide if Harper had died. (DPFF No. 48). Simple

battery is defined as causing "bodily harm to another by an act done with intent to cause bodily harm to that person or another without consent of the person so harmed[.]" Wis. Stat. § 940.19(1)

The evidence showed probable cause for arrest under the domestic abuse statute, Wis. Stat. § 968.075, and, at minimum, for simple battery. The domestic abuse statute applied because Marciniak and Harper currently resided together or formerly did. (DPFF No. 1-6, 10, 18). The evidence of a physical altercation met the statutory prerequisites for probable domestic abuse and at minimum simple battery. (DPFF No. 37-40, 45). Not only did probable cause support Marciniak's arrest, but Wis. Stat. § 968.075 required it because the obvious physical injury to Harper, the relative lack of injury to Marciniak, and the state of the bedroom upon entry, produced a reasonable suspicion that Marciniak was the predominant aggressor. (DPFF No. 45).

### c. Plaintiffs' "Exculpatory" Evidence is Irrelevant

Plaintiffs' discovery explored an argument that defendants did not sufficiently consider "exculpatory" evidence allegedly showing that Marciniak did not push Harper out the window. As their argument goes, if Marciniak did not push Harper, then police did not have probable cause to arrest Marciniak for domestic abuse. (See Dkt. 1, Complaint, ¶ 39). That is legally incorrect. Once probable cause is established, police are not compelled to investigate extenuating circumstances or search for exculpatory information to undermine it. *Burritt v. Ditlefsen*, 807 F.3d 239, 250 (7th Cir. 2015). Nor are police required to wait to make an arrest pending further investigation. *Stokes v. Bd. of Educ. of the City of Chicago*, 599 F.3d 617, 624 (7th Cir. 2010).

The plaintiffs' argument also ignores the reality that, even if Harper fell out of the window instead of being pushed or thrown, it does eliminate the evidence of a physical altercation present in the room from which Harper fell. "The mere passage of time or de-escalation of the incident does not mean that the initial act is no longer grounds for arrest." *Bradley v. Flynn*, No. 13-CV-859-BBC, 2015 WL 137302, at *3 (W.D. Wis. Jan. 9,

2015)(citations omitted)(Declaration of Amanda E. Melrood, Exh. A).

Even if police were required to consider what the plaintiffs urge was exculpatory evidence, plaintiffs cannot show that defendants were aware of the purported evidence or that it was truly exculpatory. Plaintiffs allege that a neighbor's cell phone recording of Harper hanging onto the side of the apartment building and then falling, and Harper's alleged statement to SPD officers that Marciniak "didn't do anything" are exculpatory evidence.

However, the cell phone "video" is actually more of an audio recording because the video is so dark as to be almost unviewable. Harper's recorded pleas for help and profane demands to be pulled back in the window, do not defeat probable cause to arrest Marciniak. The recording does not, in any fashion, show *how* Harper came to be hanging outside a fourth-story window, whether there had been an altercation between Harper and Marciniak, who did what to whom, or even establish that Harper "fell" out of the window on his own. *See McBride v. Grice*, 576 F.3d 703, 708 (7th Cir. 2009). To the extent that anything visual can be distinguished at all, the cell phone video begins with Harper already hanging from the window before he eventually fell. (DPFF No. 84). The only audio that could be distinguished by any of the officers who viewed the cell phone video at the scene was of Harper yelling for help and a thud when he hit the ground. (DPFF No. 85-87). Liebenthal did not view the cell phone video that night because he was not on the scene. (DPFF No. 88).

Indeed, to assist in determining what had been audibly recorded by the cell phone of an across-the-street neighbor, the Milwaukee County Investigative Team ("MCIT"), which took over the domestic abuse investigation after Marciniak hanged himself, first downloaded the video from the witness's cell phone, created a DVD, and played the DVD on AV equipment. (DPFF No. 100-101). After that, they could hear Harper saying "wake your fucking ass up and

pull me into the fucking house." (DPFF No. 102). It would be pure speculation to argue that because MCIT could hear statements on the video after digital enhancement, Sgt. Smith and Taraboi were able to hear them on the cell phone at the scene. *See Pulera v. Sarzant*, 966 F.3d 540, 551 (7th Cir. 2020). Evidence that police do not know about does not factor into the probable cause analysis. *See Eymann*, 962 F.3d at 286 (probable cause is evaluated based on the facts and circumstances within the officer's knowledge at the time arrest).

As to Harper's alleged statement from his hospital bed to SPD Officer Theron Rogers ("Rogers") that Marciniak hadn't done anything, responding NSFD paramedics testified that Harper was actually incoherent at the scene. (DPFF No. 14). After Harper was taken to the hospital, Sgt. Smith sent Rogers to interview Harper because Harper's condition at the scene prevented him from giving a statement to police. (DPFF No. 50). Rogers has declared that, at some undefined time while at the hospital, Harper told him "his 'roommate' didn't do anything," but when pressed for details Harper said "he didn't want to talk at that time[.]"(DPFF No. 51). Harper does not remember giving such a statement to Rogers. (DPFF No. 52).

Importantly, there is no evidence that any of the defendants knew about Harper's allegedly exculpatory statement prior to Marciniak hanging himself. Rogers' declaration does not state when he talked to Harper or when he spoke with Sgt. Smith to update him on Harper's purported statement. (DPFF No. 54). Officer Rogers does not even say whether he relayed Harper's comment to Sgt. Smith at all. (DPFF No. 55). Even if defendants had somehow been aware of Harper's statement though, such a statement would certainly not have required Marciniak's release from custody; it is unfortunately well-recognized that domestic abuse victims will deny an assault to protect their abuser. *Anderson v. City of W. Bend Police Dep't*, 774 F. Supp. 2d 925, 940 (E.D. Wis. 2011). Officers with probable cause need not cancel an

investigation on request. *Hanson v. Dane Cty.*, Wis., 608 F.3d 335, 338 (7th Cir. 2010).

Here, defendants had probable cause to arrest Marciniak. Arguments about exculpatory statements, even if true, were neither within defendants' knowledge, nor would they have compelled Marciniak's release. Plaintiffs' federal false arrest claim must be dismissed.

## II.    THE SEARCH OF MARCINIAK COMPLIED WITH THE CONSTITUTION.

Taraboi conducted a custodial search of Marciniak at the SPD lockup. (DPFF No. 65). Regardless of whether Marciniak's shorts sagged down during the walk from the squad car to the interview room or occurred during the subsequent custodial search, the search itself was reasonable. Plaintiffs fail to state a cause of action for violation of substantive or procedural due process rights, and their second, third, and fourth causes of action, which are only against Taraboi, (Dkt. 1, Complaint, p. 19-20), must be dismissed upon the merits.

### a.    <u>Marciniak Was Not Strip Searched</u>

Each of plaintiffs' search-related claims is based on the allegation that Taraboi's custodial search of Marciniak was a "strip search" under Wis. Stat. § 968.255. (Dkt. 1, Complaint,¶¶ 60, 123-141). The statute defines a "strip search" as one "in which a detainee's genitals, pubic area, buttock or anus, or a female detainee's breast, is uncovered and either is exposed to view or is touched by a person conducting the search[.]" Wis. Stat. § 968.255(1)(b). The phrase "exposed to view" refers to anyone not involved in the search. *Newman v. Vagnini*, No. 15-CV-1363-JPS, 2016 WL 6090859, at *3 (E.D. Wis. Oct. 18, 2016)(citing Wis. Stat. § 968.255(b)(2)(ag) and (b))(Melrood Dec., Exh. B). "Strip search" has an imprecise meaning in federal law, but involves intention or instruction from the officer conducting the search to expose the suspect's body parts. *See Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 325, 132 S. Ct. 1510, 182 L. Ed. 2d 566 (2012).

In this case, a hastily dressed Marciniak had his shorts sag down as he exited the squad car for the short walk from the SPD sally port to one of SPD's interview rooms. (DPFF No. 35, 59). It did not occur during Taraboi's custodial pat-down search of Marciniak. (DPFF No. 69). Two UWM officers who were present during Marciniak's transport and search testified that they never saw Marciniak's genitals, pubic area, buttocks and/or anus. (DPFF No. 62). After Marciniak's shorts sagged during the walk in the sally port, Taraboi held Marciniak's shorts up for the rest of the walk to prevent them from falling again. (DPFF No. 61). Taraboi never pulled Marciniak's shorts down, nor did he instruct that they be pulled down. (DPFF No. 63). Taraboi never touched Marciniak's uncovered genitals, pubic area, buttocks and/or anus during the subsequent custodial search. (DPFF No. 64). There simply was no "strip search" of Marciniak under Wis. Stat. § 968.255 or federal law, and the plaintiffs' allegations in that regard are completely unsubstantiated by the evidence in this case.

### b. <u>The Search Did Not Require Reasonable Suspicion</u>

Plaintiffs allege that Taraboi's search of Marciniak was unreasonable because he did not have reasonable suspicion to conduct the search. (Dkt. 1, Complaint, ¶¶ 57, 124-127). But the Fourth Amendment <u>does not require</u> reasonable suspicion for searches in a jail or those conducted as part of a detention facility's intake process. *Florence*, 566 U.S. 318, 330, 339; *Brown v. Polk Cty., Wisconsin*, 965 F.3d 534, 538 (7th Cir. 2020) (citations omitted) (emphasis added). Further, a search incident to arrest does not require additional justification. *W. Bend Police Dep't*, 774 F. Supp. 2d at 945 (*citing United States v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973)). A search that could have been performed at the time of arrest may be conducted at the station house. *United States v. Edwards*, 415 U.S. 800, 803, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974).

14

Taraboi's search of Marciniak was conducted incident to arrest and as part of SPD standard intake procedure. (DPFF No. 65). SPD policy required that prisoners be searched for weapons or contraband prior to being placed in a lockup cell. (DPFF No. 66). SPD had this policy in place because of concerns for institutional security, officer safety, and inmate safety. (DPFF No. 67). This alone makes the search reasonable under *Florence* and *Robinson*.

Moreover, to the extent that plaintiffs claim that Marciniak's sagging shorts on the way to the interview room constituted a search, let alone a strip search, the "**incidental observations of undressed inmates—**particularly ones that are infrequent or at a distance—that are inherent to the continuous surveillance necessary in prisons **are almost always reasonable**." *Henry v. Hulett*, 969 F.3d 769, 783-784 (7th Cir. 2020) (emphasis added). Searches may be conducted without reasonable suspicion of concealed weapons or contraband, as part of the intake process, even if they include a visual inspection while the arrestee is undressed, and that dynamic strikes a reasonable balance between detainee privacy and needs of the detention institution. *Florence*, 566 U.S. at 322, 330, 339. Taraboi's custodial pat-down search of Marciniak was reasonable, even if plaintiffs claim that the walk to the interview room was part of the search.

### c. <u>Plaintiffs Cannot State a Claim for Violation of Substantive Due Process</u>

Plaintiffs allege that Marciniak had a substantive due process right to "body" integrity and that Taraboi violated that right by conducting a strip search. (Dkt. 1, Complaint, ¶¶ 129-131). However, there is no substantive due process right to be free of strip searches. Federal law is unequivocal that "arrested persons can be strip-searched[.]" *United States v. Johnson*, 874 F.3d 571, 578 (7th Cir. 2017) (*citing Florence*, 566 U.S. at 339).

Further, the Fourth Amendment, not the Fourteenth, protects a detainee's right to bodily privacy. *Henry*, 969 F.3d at 779. "Claims 'covered by a specific constitutional provision, such as

15

the Fourth or Eighth Amendment ... must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.'" *Henry*, 969 F.3d at 781 (*quoting United States v. Lanier*, 520 U.S. 259, 272 n.7, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)). Because plaintiffs allege that Marciniak's right to bodily integrity was violated by a search, their claim is governed by the Fourth Amendment, as addressed above, and their claim for violation of substantive due process must be summarily dismissed upon its merits.

### d. Plaintiffs Cannot State a Claim for Violation of Procedural Due Process

Plaintiffs allege that Taraboi intentionally deprived Marciniak of liberty interests created by Wis. Stat. § 968.255 – which requires that a strip search be conducted by a person of the same sex and that the person searched is not exposed to the view of any person not conducting it – and they further allege that those interests are entitled to due process protection. (Dkt. 1, Complaint, ¶¶ 129-131).

However, "violations of Wisconsin state statutes are irrelevant to a Section 1983 inquiry, and plaintiff is misguided to rely upon them" to state a federal claim. *White v. Olig*, 56 F.3d 817, 820 (7th Cir. 1995). State statutes may create liberty interests, but federal constitutional law defines the procedural protections. *White*, 56 F.3d at 821. Failure to follow state procedures does not establish a violation of federal law. *Id.* (*citing Kraushaar v. Flanigan*, 45 F.3d 1040, 1048-1049 (7th Cir. 1995)).

In *Kraushaar v. Flanigan*, the Seventh Circuit held that an Illinois strip-search statute did not create substantive rights or legally enforceable expectations, because it merely created guidelines directing the manner in which state personnel exercised their discretion to perform strip searches. 45 F.3d at 1048-1049 (citation omitted). By arguing that the state statute created both the liberty interest and the process by which it may be deprived, the appellant was

implicating a <u>substantive</u> due process right. 45 F.3d at 1049. The Supreme Court of the United States has never held that a state-created interest is protected by substantive due process. 45 F.3d at 1047, 1049. The Seventh Circuit has also recognized that the due process clause does not treat state procedural requirements as substantive entitlements in their own right. *Bell v. McAdory*, 820 F.3d 880, 884 (7th Cir. 2016).

Even if Wis. Stat. § 968.255(2)(am)-(b) could be argued to create liberty interests, they were not violated in this case, and Marciniak was not deprived of such interests. First, no strip search as defined by the statute was ever conducted. (DPFF No. 59, 62-65, 68-69). Second, Marciniak, a male, was searched by someone of the same sex: Taraboi, also male. (Dkt. 1, Complaint, ¶¶ 1, 10, 28, 31, 35, 42, 48). Third, Marciniak was not exposed to the view of the two UWM officers present, who were not conducting the search, as both officers testified that they never saw Marciniak's shorts sag, and never saw his genitals, pubic area, buttocks and/or anus. (DPFF No. 62, 68).

More importantly, plaintiffs cannot identify what, if any, federal due process protection attaches to the claimed liberty interests; they only allege that the liberty interests are "entitled to due process protection." (Dkt. 1, Complaint, ¶ 129-131). Like the appellant in *Kraushaar*, plaintiffs have claimed a substantive due process right by alleging that Wis. Stat. § 968.255 both created liberty interests and described the process due. But the federal government is not the enforcer of state law and "'state procedural protections cannot define what process is due.'" *Kraushaar*, 45 F.3d at 1049 (*quoting Colon v. Schneider*, 899 F.2d 660, 670 (7th Cir. 1990)). Finally, as discussed above, search-related deprivations are examined under the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ("Because the Fourth Amendment provides an explicit textual source of constitutional protection

against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.").

### III.   DEFENDANTS DID NOT VIOLATE MARCINIAK'S RIGHT TO MEDICAL CARE DURING ARREST OR DETENTION.

Plaintiffs' fifth, sixth, and seventh causes of action allege a failure to provide medical care and attention, and to protect Marciniak from self-harm. Their claims are based on allegations that Maciniak was a demonstrable suicide risk, and that the officers' interaction with Marciniak should have focused on a medical and/or mental health intervention (Dkt. 1, Complaint, ¶¶ 41, 64, 66, 94, 142-165). Plaintiffs essentially fault defendants for failing to prevent Marciniak's suicide. However, Defendants did not have notice of Marciniak's risk of suicide and their actions were reasonable in light of what they knew at the time of his arrest. There is no evidence that, had defendants done anything plaintiffs claim should have been done, Marciniak would have lived. There is no constitutional right protecting citizens from violence not performed by the state.

### a.   Police Response to Detainee Medical Needs Must be Reasonable Under the Circumstances

Police response to a detainee's medical needs, including risk of suicide, is governed by the Fourth Amendment when the detainee has not yet had a probable cause hearing. *Pulera*, 966 F.3d at 549. Plaintiffs must show that defendants' actions were objectively unreasonable under the totality of the circumstances, and that they caused injury. *Id*. at 550. Marciniak's three medical claims must be analyzed as one, and defendants' actions at three points in time must be considered together. *See Florek v. Vill. of Mundelein, Ill*., 649 F.3d 594, 599 (7th Cir. 2011).

The court considers four factors in assessing the reasonableness of an officer's actions: 1) the officer's notice of the detainee's medical need, 2) the seriousness of the medical need, 3) the

scope of the alleged required treatment, and 4) the police interests involved. *Lovett v. Herbert*, 907 F.3d 986, 992 (7th Cir. 2018); *Estate of Perry v. Wenzel*, 872 F.3d 439, 453 (7th Cir. 2017). Police officers can be placed on notice of a detainee's serious medical condition either by word or observation of the detainee's physical symptoms. *Perry*, 872 F.3d at 454 (*citing Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007)).

### b. Defendants Did Not Have Notice of Marciniak's Risk of Suicide

Plaintiffs' medical claims are premised on the argument that defendants had notice of Marciniak's risk of suicide. Specifically, plaintiffs claim that officers were on notice of Marciniak's suicide risk because: Marciniak was drunk and/or under the influence of drugs, he appeared disoriented, his t-shirt was inside out and backwards, he failed to react when his shorts fell down in the presence of a female officer, he was frustrated and ripped his necklace off during intake, he told Sgt. Smith that he had psychiatric treatment in the past, he banged on his cell, he made odd motions with his blanket around the cell door, he had a prior heroin overdose that might possibly have been a suicide attempt, and that Harper (not Marciniak) told an SPD officer following an unrelated event - two days before Marciniak's arrest – that Marciniak was depressed and "had attempted suicide in the past." (Dkt. 1, Complaint, ¶¶ 15, 63, 67-68, 76-77, 79-89, 92-93, 95-99).

None of those factors gave defendants notice that Marciniak was a suicide risk. First, being drunk or intoxicated is not suicidal behavior. *See Pulera*, 966 F.3d at 545. Being disoriented, disheveled in appearance, and having poor coordination or slow reactions are all reasonably interpreted as the behavior an intoxicated person. Marciniak banged on his cell, but told Sgt. Smith that he wanted to go home. (DPFF No. 91-92). Hardly indicative of a suicide risk. *See id.* at 545, 550-551 (arrestee standing on bench and yelling, which he said was because

he was cold, not because he was suicidal, did not make intake officer aware of his suicidal thoughts).

Marciniak said he received psychiatric treatment in the past, (DPFF No. 77), but this did not indicate that he was presently depressed or requesting treatment for suicide risk. *Pulera*, 966 F.3d at 551, 553 (detainee's request for anxiety and depression medication did not put prison nurse on notice of a risk of suicide because he did not mention symptoms and did not say he was depressed). Even current treatment with antidepressant medication does not raise an issue of suicide risk because "'not every prisoner who shows signs of depression ... can or should be put on suicide watch.'" *Id.* at 551 (*quoting Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 558 (7th Cir. 2003))(ellipsis in original). Summary judgment is proper when a detainee's outward appearance did not put officers on notice of the detainee's serious condition. *Id.* at 553-554 (*citing Florek*, 649 F.3d at 600). Here, on August 15, 2016, Marciniak's outward appearance and behavior did not put defendants on notice of a suicide risk.

Marciniak's "motions" with the blanket near his cell door, captured in the lockup hallway security video, are ambiguous at best; it is unreasonable to argue that throwing a blanket against the cell bars amounts to suicidal behavior. Even if the blanket motions signaled agitation at a suicidal level, there is no evidence that Sgt. Smith ever saw that footage as it was being recorded. Indeed, Sgt. Smith testified that he has never seen *any* security footage. (DPFF No. 99).

Similarly, the content of Rekuski's interview with Harper two days before Marciniak's arrest had not yet been reduced to report form prior to Marciniak's hanging. (DPFF No. 103). Rekuski did not verbally inform anyone of the contents of his interview with Harper until the *evening* of August 15, 2016, during the aftermath of Marciniak's hanging, and he had not written or filed his report until August 17, 2016. (DPFF No. 109-112). No defendant received any report

about Harper's opinions concerning Marciniak's mental health prior to Marciniak's arrest.

Similarly, there is no evidence that Marciniak's heroin overdose, a couple days prior to his arrest, was a suicide attempt: he did not make any suicidal statements to responding EMTs that day, and in fact he affirmatively told investigating SPD officers, following his overdose, that he was not suicidal and had no desire to harm himself. (DPFF No. 7-8). Most important, Marciniak expressly told Sgt. Smith during intake on August 15 that he was <u>not</u> suicidal and had <u>not</u> attempted suicide. (DPFF No. 80). Marciniak did not appear to be overly depressed, anxious, or upset and he was not distraught. (DPFF No. 78). Marciniak never told SPD officials that he had thoughts of self-harm or committing suicide. (DPFF No. 80).

All of the "signs" that plaintiffs point to as giving notice of Marciniak's suicide risk are temporally impossible, or pure conjecture. Mere speculation or conjecture that raises only a "metaphysical doubt" is insufficient to withstand summary judgment. *King v. Hendricks Cty. Commissioners*, 954 F.3d 981, 985 (7th Cir. 2020). Defendants cannot be "even negligently responsible for a suicide risk" that Marciniak never told them about. *Pulera*, 553-554.

### c. Defendants Cared for Marciniak's Apparent Medical Needs

Defendants acted reasonably in response to what they knew about Marciniak's condition at the three instances plaintiffs claim they failed to provide care. At the time of arrest, plaintiffs allege that Sgt. Smith failed to determine whether arresting Marciniak was medically appropriate and that defendants otherwise failed to "take action to provide" unidentified medical and/or mental health care. (Dkt. 1, Complaint, ¶¶ 40-41, 143-145). Second, plaintiffs claim that after Marciniak arrived at the SPD station, Marciniak should have been transported to a "facility" for unidentified medical and/or mental health care, or held in an interview room instead of being placed in a cell. (Dkt. 1, Complaint, ¶¶ 63-65, 153). Finally, once Marciniak was in the cell,

plaintiffs argue that Sgt. Smith and Taraboi failed to take again-unidentified "reasonable measures" to prevent Marciniak from harming himself. (Dkt. 1, Complaint, ¶ 161).

To the contrary, defendants acted reasonably at the scene of arrest to obtain medical care for Marciniak. NSFD paramedics and EMTs were summoned, and they specifically assessed Marciniak in the apartment. (DPFF No. 29). They recorded his vital signs and noted Marciniak was groggy but not agitated or distraught. (DPFF No. 29). NSFD also noted that Marciniak did not make any suicidal statements. (DPFF No. 29). Marciniak actively refused to go to the hospital. (DPFF No. 30). Although Marciniak appeared to be under the influence of alcohol and/or drugs, responding personnel determined that he was not intoxicated to an extent that required involuntary treatment. (DPFF No. 31). Because Marciniak was appropriately answering NSFD questions indicating that he was competent to refuse treatment, NSFD released Marciniak to the SPD. (DPFF No. 32-33). Defendants relied on NSFD's professional medical judgment that it was safe to take Marciniak into custody. (DPFF No. 34, 42-43). Plaintiffs do not identify what other medical and/or mental health care defendants should have "taken action" to provide. Summoning paramedics to evaluate a detainee's medical condition is a reasonable response to the detainee's medical needs. *Florek*, 649 F.3d at 599-601. Defendants were also entitled to rely on NSFD's professional medical judgment that Marciniak did not need to be forced to receive additional medical care. *Perry*, 872 F.3d at 458.

Marciniak's arrest is the only stage at which plaintiffs claim Liebenthal should be liable for lack of medical care to Marciniak. (Dkt. 1, Complaint, ¶¶ 142-148). But Liebenthal did not have any personal contact with Marciniak, (DPFF No. 82), and he is therefore further entitled to summary judgment on this claim. A supervising officer is not liable under § 1983 for failing to provide medical care, regardless of what his subordinates did, if the supervisor did not have

personal contact with the arrestee and did not otherwise have an indication of a detainee's medical need. *Pulera*, 966 F.3d at 552; *see also Perry*, 872 F.3d at 459 (personal involvement in the alleged constitutional deprivation is required for individual liability under § 1983).

There was no material change in Marciniak's condition between his arrest and his harming himself that would have caused Sgt. Smith or Taraboi to have abandoned the NSFD's professional judgment that it was safe to detain Marciniak. (DPFF No. 72, 77-80, 89). Marciniak was banging on his cell, but he explained that it was because he wanted to go home. (DPFF No. 91-92). There is no evidence that Marciniak requested medical or mental health care and he never told Sgt. Smith or Taraboi that he was suicidal. Defendants did not have notice of his suicide risk, and therefore departmental policies regarding suicidal detainees were not implicated. Even if they were, violation of department policy is not a violation of constitutional rights enforceable under 42 U.S.C. § 1983. *Pulera*, 966 F.3d at 551 (*citing Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006)).

Sgt. Smith performed visual welfare checks on Marciniak at 2:53, 3:12, 3:16, 3:23, and 3:33 a.m. and discovered him hanging in his cell at 4:19 a.m. (DPFF No. 93, 95). The timing between the last two visual checks did not meet SPD internal policy, but all of Sgt. Smith's visual checks conformed to state regulations requiring checks every hour. Wis. Adm. Code. DOC § 349.12; (DPFF No. 94). The fact that, after Marciniak was cut down and he was being provided with emergency care, Sgt. Smith panicked and placed a doctored entry purporting to have checked on Marciniak at 4:00 a.m., (DPFF No. 96, 98), was obviously inappropriate – but it had no bearing on the reasonableness of Sgt. Smith's prior actions.

Plaintiffs do not identify what sort of facility Sgt. Smith or Taraboi should have taken Marciniak to; nor is there any evidence about the kind of medical and/or mental health treatment

that Marciniak needed. Plaintiffs fail to identify "reasonable measures" Sgt. Smith and Taraboi should have taken to prevent Marciniak's suicide. Given Marciniak's express statements during intake that he was not suicidal, and in the absence of more significant indirect signs, (DPFF No. 77-80, 89, 91-92), no rational jury could find that Sgt. Smith and Taraboi acted unreasonably by placing Marciniak in a cell or conducting visual checks as required by law. *See Pulera*, 551.

The fact that Marciniak completed his suicide is a tragedy. But that "does not mean the officers are responsible. All that one can expect—and all the Constitution demands—is that officials respond reasonably to the situation presented." *Pulera*, 966 F.3d at 556. There simply is no Constitutional right to be prevented from committing self-harm; there is no Constitutional right to be protected from private violence, even if it's violence against yourself. *Collignon v. Milwaukee Cty.*, 163 F.3d 982, 987 (7th Cir. 1998) (*quoting DeShaney v. Winnebego County Dept. of Social Servs.*, 489 U.S. 189, 195, 197, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)).

### d. <u>Plaintiffs Have No Evidence to Establish the Causal Element of Their Claims</u>

Section 1983 plaintiffs must allege and establish causation as an element of their legal claim. *Muckway v. Craft*, 789 F.2d 517, 521 (7th Cir. 1986); *Pulera*, 966 F.3d at 550. Where § 1983 claims are premised on in-custody death, the causation question is properly stated as whether, had the defendants done what they should have done in light of what they observed about the detainee, would the detainee have died or experienced pain or suffering prior to death. *Ortiz v. City of Chicago*, 656 F.3d 523, 534 (7th Cir. 2011). In *Pulera*, the plaintiff failed to establish cause because he did not have expert testimony to support the theory that he would not have attempted suicide if he had received his medication. 966 F.3d at 548, 552.

In our case, plaintiffs have identified only one expert witness – an expert on police procedure, not an expert on suicide or on jail operations concerning suicide. They have not

identified or disclosed any medical or psychological experts. They do not have an expert to testify about what sort of medical and/or mental health treatment they assert should have been provided to Marciniak. They do not have an expert to testify as to what "reasonable measures" Sgt. Smith and Taraboi should have taken to prevent Marciniak's self-harm.

Plaintiffs plainly do not have an expert to opine that, had defendants done the things they do specify Marciniak would have lived. It is not sufficient on summary judgment for plaintiffs to rely on their allegations that Marciniak would have survived. *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 972 (7th Cir. 2020); (Dkt. 1, Complaint, ¶ 163). Here, there is no evidence that defendant's alleged failures caused Marciniak's suicide, so plaintiffs' medical claims must be dismissed. *See Pulera*, 966 F.3d at 552 ("record contains no evidence from which a factfinder could infer that, had Pulera received his medications, he would not have attempted suicide.")

## IV.    QUALIFIED IMMUNITY DEMANDS DISMISSAL OF PLAINTIFFS' FEDERAL CLAIMS.

### a.    <u>Qualified Immunity for Federal Claims</u>

Qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152, 200 L. Ed. 2d 449 (2018) (internal quotation marks and source omitted). Once the qualified immunity defense is raised, it is the plaintiff's burden to defeat it by showing (1) defendants violated a constitutional right, and (2) the right was clearly established at the time such that it would have been clear to a reasonable officer that his or her conduct was unlawful. *Ewell*, 853 F.3d at 919 (citations omitted). These two prongs can be addressed in any order. *Id*.

A right is clearly established if "dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority.'" *Henry*, 969 F.3d at 785 (citation omitted). There need not be a case directly on point, but "existing precedent must have placed the statutory or constitutional

question beyond debate." *White v. Pauly*, 580 U.S. –, –, 137 S. Ct. 548, 551, 196 L. Ed. 2d 463 (2017). The facts analyzed are limited to those knowable to the officers at the time of the conduct. *Hernandez v. Mesa*, – U.S. –, 137 S. Ct. 2003, 2007, 198 L. Ed. 2d 625 (2017). The violation must be "so obvious that a reasonable person would have known the unconstitutionality of the conduct at issue." *Brokaw v. Mercer Cty.*, 235 F.3d 1000, 1022 (7th Cir. 2000). Qualified immunity attaches unless not even one reasonable officer in defendants' situation would have thought that his or her conduct was lawful. *Plumhoff v. Rickard*, 572 U.S. 765, 778-779, 134 S. Ct. 2012, 2023, 188 L. Ed. 2d 1056 (2014).

### b. Defendants Are Immune From Any Claim by Plaintiff Izariah Jump That He Has a Federal Cause of Action for Loss of Society and Companionship

At the time of defendants' allegedly wrongful acts, there was no clearly established constitutional right of an adult or minor child in a familial relationship with a parent. *See Estate of Fiebrink by Cade v. Armor Corr. Health Servs., Inc*., No. 18-CV-832-JPS, 2019 WL 1980625, at *11 (E.D. Wis. May 3, 2019)(slip op.)("The Seventh Circuit has yet to consider whether minor children have standing to bring claims under Section 1983 for loss of society or companionship of a parent.")(Melrood Dec., Exh. C); *Anderson v. Westfield Ins. Co*., 300 F. Supp. 2d 726, 727 (W.D. Wis. 2002) (adult children can recover for loss of society and companionship under <u>state</u> statute). Defendants are entitled to the protection of qualified immunity, and any *federal* claim on behalf of plaintiff Izariah Jump for loss of society and companionship must be dismissed.

### c. Defendants are Immune from Plaintiffs' Federal False Arrest Claim

Qualified immunity protects officers who "reasonably but mistakenly believe that probable cause exists[.]" *Abbott*., 705 F.3d at 715. "Arguable probable cause" exists if a reasonable office in the same circumstances and with the same knowledge could have reasonably believed that probable cause existed. *Huff v. Reichert*, 744 F.3d 999, 1007 (7th Cir. 2014).

Probable cause of any crime will support a qualified immunity defense. *Abbott*, 705 F.3d at 715.

The evidence of an altercation in the apartment bedroom, (DPFF No. 26, 37-40), would give a reasonable officer good reason to believe that a fight had occurred, and for the reasons discussed *supra*, that probable cause supported Marciniak's arrest for domestic abuse and battery. Regardless of whether defendants properly weighed "exculpatory" evidence, indeed even if the officers were mistaken about probable cause, it would not have been obvious to a reasonable officer in defendants' position that they were violating Marciniak's Fourth Amendment rights in arresting him. *See Zappa,* 819 F.3d at 1005; *Funches,* 327 F.3d at 587. Defendants are entitled to qualified immunity protection from plaintiffs' false arrest claim.

### d. __Defendants are Immune from Plaintiffs' Claims of Illegal Search__

There is no constitutional right to require "reasonable suspicion" for a search incident to arrest, *W. Bend Police Dep't*, 774 F. Supp. 2d at 945, or for a custodial search upon intake into a detention facility, *Florence*, 566 U.S. at 330. There is no constitutional right for an arrestee to be free of strip searches. *Johnson*, 874 F.3d at 578. There is no substantive due process protection against strip searches, *Henry*, 969 F.3d at 781, nor procedural due process protection for liberty interests and procedures asserted to be defined by state law. *Kraushaarn*, 45 F.3d at 1048-1049. Therefore, defendants are entitled to qualified immunity on plaintiffs' search-related claims.

### e. __Defendants are Immune from Plaintiffs' Medical Care, Attention, and Self-Harm Claims__

There is no established Fourth Amendment right to reasonable medical treatment absent notice of a detainee's medical need. *Lovett*, 907 F.3d at 992. Defendants did not have notice of Marciniak's suicide risk; they knew only about Marciniak's obvious intoxication. (DPFF No. 6-8, 29, 31, 72, 77-80). Intoxication, even severe, does not mean indicate imminent or ongoing danger, and impairment decreases with time. *Lovett*, 907 F.3d at 993. The Seventh Circuit "and

the Supreme Court have required a much higher level of obvious risk to deny qualified immunity based on the Fourth Amendment's general requirement of reasonable conduct with respect to detainees." *Id*. Detainees do not have an absolute constitutional right to have the state prevent them from committing suicide. *See Collignon*, 163 F.3d at 987. Accordingly, defendants are entitled to qualified immunity protection against plaintiffs' medical claims.

## V. PLAINTIFFS' STATE LAW CLAIMS MUST BE DISMISSED OR REMANDED TO STATE COURT

Plaintiffs have three Wisconsin law claims: false arrest without warrant, wrongful death under Wis. Stat. § 895.04, and indemnification against the Village of Shorewood under Wis. Stat. § 895.46. (Dkt. 1, Complaint, ¶¶ 172-179). All three must be dismissed for the same reasons that plaintiffs' federal claims must be dismissed. In the alternative, upon the dismissal of the federal claims, the plaintiffs' state claims should be remanded to state court for resolution.

### a. Plaintiffs Cannot Prove Their State Claims

Wisconsin law on probable cause for arrest tracks the federal standard, permitting law enforcement officers to make a warrantless arrest when they have reasonable grounds to believe that the person is committing or has committed a crime. Wis. Stat. § 968.07(1)(d). "Reasonable grounds" is equivalent to probable cause. *State v. Popke*, 2009 WI 37, ¶ 14, 317 Wis. 2d 118, 128, 765 N.W.2d 569, 574. For the same reasons discussed above regarding plaintiffs' federal false arrest claim, plaintiffs' state false arrest claim must be dismissed.

To establish a claim for wrongful death, plaintiffs must prove that defendants' negligent or intentional acts or omissions caused Marciniak's death. Wis. Stat. § 895.03; *Kelly v. Mohrhusen*, 50 Wis. 2d 337, 340, 184 N.W.2d 149, 151 (1971). As discussed above, plaintiffs do not have expert testimony to support their claim that, had defendants done anything differently, Marciniak would have lived. With no causal link between defendants' allegedly wrongful

omissions and Marciniak's death, plaintiffs' state wrongful death claim must be dismissed.

The indemnification claim against the Village of Shorewood is contingent upon entry of judgment against its individual officers: Liebenthal, Sgt. Smith, and Taraboi. Wis. Stat. § 895.46; (Dkt. 1, Complaint, ¶ 179). If plaintiffs' claims against the individual defendants are dismissed, there is no claim against the Village, and plaintiffs' indemnification claim must be dismissed.

### b. <u>Discretionary Immunity Protects Defendants from Plaintiffs' State Claims</u>

Defendants are entitled to discretionary immunity for plaintiffs' state law claims. Under Wis. Stat. § 893.80, discretionary acts of governmental entities, their officers, and employees are immune from liability. *Wilson v. City of Milwaukee*, 138 F. Supp. 2d 1126, 1130 (E.D. Wis. 2001) (*citing Kierstyn v. Racine Unified School Dist*., 228 Wis. 2d 81, 596 N.W.2d 417, 421–22 (1999)). Discretionary acts involve the exercise of judgment applying rules to facts; in contrast, the performance of ministerial acts raises no immunity, but requires conduct that is absolutely and certainly prescribed by law. *DeFever v. City of Waukesha,* 2007 WI App 266, ¶¶ 7-8, 306 Wis. 2d 766, 743 N. W.2d 848 (internal citation omitted). "There is general personal tort immunity for a public official acting within the scope of his official authority and in the line of his official duties." *Cords v. Anderson*, 80 Wis. 2d 525, 539, 259 N.W.2d 672, 679 (1977).

Defendants are immune from plaintiffs' state claims because their decisions to arrest Marciniak and whether, when, and how to provide medical treatment are all discretionary acts involving the exercise of judgment. "[D]ecisions by law enforcement officers concerning whether and how to arrest someone are discretionary for purposes of Section 893.80(4)." *Wilson*, 138 F. Supp. 2d at 1130. Even to the extent that making an arrest under Wisconsin's domestic abuse law is ministerial, the statute provides immunity when the decision to arrest "is made in a good faith effort to comply with § 968.075 [the domestic abuse statute]." Wis. Stat. § 968.075(6m). The "medical discretion" exception to governmental immunity only applies to

medical professions; it does not extend to police officers. *Perry*, 872 F.3d at 463 (citations omitted). Accordingly, defendants are immune from plaintiffs' state law claims.

## CONCLUSION

Probable cause supported arrest Marciniak. There was no strip search; the custodial pat-down search was objectively reasonable. Plaintiffs cannot prove claims for violation of substantive or procedural due process rights. Defendants did not have notice of Marciniak's suicide risk, and there is no evidence to establish cause between defendants' alleged failures and Marciniak's self-harm. Marciniak's treatment was reasonable under the totality of the circumstances. Defendants are entitled to qualified immunity on plaintiffs' federal claims and discretionary immunity on their state claims. Without claims against the individual defendants, the indemnification claim against the Village of Shorewood must be dismissed as well.

Therefore, defendants request that the court grant summary judgment dismissing all of plaintiffs' claims, upon the merits and with prejudice. Alternatively, defendants request remand of state claims to Wisconsin state court if they survive summary judgment.

Dated this __1st___ day of February, 2021.

> SCHMIDT &WIRTH LAW OFFICES
> Attorneys for the Village of Shorewood, Thomas
> Liebenthal, Cody J. Smith, and Nicolas Taraboi
>
>  */s/ electronically signed Joseph M. Wirth*
> JOSEPH M. WIRTH
> State Bar No.: 1012080

P.O. Address:
788 N. Jefferson Street
Suite 500
Milwaukee, WI 53202-4620
Telephone: (414) 225-4060
Fax: (414) 271-6196
jmw@piperschmidt.com