UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

IZARIAH JUMP, and
ESTATE OF JONAH MARCINIAK,
by special Administrator, Brenda Mroch,

    Plaintiffs,

v.

VILLAGE OF SHOREWOOD,
THOMAS LIEBENTHAL,
CODY J. SMITH, and,
NICOLAS TARABOI,

    Defendants.

Case No.: 19-CV-1151

## DEFENDANTS' PROPOSED FINDINGS OF UNDISPUTED FACT

The defendants, Village of Shorewood, Thomas Liebenthal, Cody J. Smith, and, Nicolas Taraboi, by their attorneys, Schmidt & Wirth Law Offices, hereby submit the following proposed findings of undisputed facts pursuant to F.R.C.P. 56 and Civil L.R. 56.

1. On July 26, 2016, officers of the Shorewood Police Department ("SPD") responded to a domestic disturbance call at 4422 North Oakland Ave, Apt. 10 between Jonah Marciniak ("Marciniak") and Eric Harper ("Harper"). (Declaration of Joseph M. Wirth, ¶¶ 1-2; Exhibits A and B).

2. Both Marciniak and Harper were drunk. (Wirth Dec., ¶¶ 1-2; Exh. A & B).

3. Marciniak stated that he threw ranch dressing at Harper and that Harper pushed him, got into his face, and yelled at him. Harper denied pushing Marciniak and stated that Marciniak had started the argument. (Wirth Dec., ¶¶ 1-3; Exh. A, p. 2, Exh. B, p.2, Exh. C, 28:11-25).

1

4. SPD separated Marciniak and Harper for the evening. (Wirth Dec., ¶¶ 1-3; Exh. A-B, Exh. C, 28:19-23).

5. Seventeen days later, on August 12, 2016, SPD Officer Matthew Grams and Sergeant Nicholas Gardner responded to 4422 N. Oakland Avenue for a report of a heroin overdose. (Wirth Dec., ¶¶ 4-5; Exh. D, Exh. E, p. 1-3).

6. The subject suffering the overdose was identified as Marciniak. He was revived by members of the North Shore Fire Department ("NSFD") and transported to Columbia St. Mary's Hospital. (Wirth Dec., ¶¶ 4-5; Exh. D, Exh. E, p. 1-3).

7. Marciniak did not give any indication to responding EMTs that the overdose was a suicide attempt or that he was feeling suicidal. (Wirth Dec., ¶ 6; Exh. F, 5:13-6:1, 21:16-22, 70:6-8, 71:9-12).

8. Officer Grams interviewed Marciniak at the hospital. His report of the interview states that "Marciniak stated he has suffered from depression but he was not felling [sic] suicidal today or [sic] had any desire to harm himself." (Wirth Dec., ¶ 5; Exh. E, p. 4).

9. Marciniak was evaluated at Columbia St. Mary's Hospital and released. (Wirth Dec., ¶ 4; Exh. D, p. 2).

10. At approximately 1:36 a.m. on August 15, 2016, SPD responded to an emergency call at 4422 North Oakland Avenue in Shorewood, Wisconsin for a report of a man, later identified as Harper, that had been yelling for help and fell from a fourth story window in an apartment building. (Wirth Dec., ¶¶ 7-10, 15; Exh. G, Exh. H, p. 1-4, Exh. I, 22:21-23:6, 23:22-24:1, Exh. J, Exh. O).

11. SPD Sergeant Cody Smith ("Sgt. Smith") and Officer Cody Smith ("Off. Smith") arrived on scene around 1:38 a.m., and Officer Nicholas Taraboi ("Taraboi") and Officer Theron

Rogers ("Rogers") arrived around 1:39 a.m. (Wirth Dec., ¶¶ 7, 9, 16; Exh. G, Exh. I, 24:8-19, Exh. P, ¶¶ 1-3).

12. The North Shore Fire Department ("NSFD") arrived on scene shortly after the SPD officers. (Wirth Dec., ¶¶ 7, 9, 11; Exh. G, p. 1, Exh. I, 28:17-23, Exh. K, 55:23-56:3).

13. Harper was badly injured, lying on the ground just outside the apartment building beneath an open, fourth floor window. (Wirth Dec., ¶¶ 7-9, 13; Exh. G, p.1, Exh. H., p. 2, 4, Exh. I, 25:4-8, 26:7-23, 30:22-24, Exh. M, 6:18-23, 15:2-4, 17:13-17, 22:8-14)

14. Harper was conscious but incoherent and SPD officers and responding NSFD personnel concluded that he could not be interviewed at the scene. (Wirth Dec., ¶¶ 6, 9, 12-13; Exh. F, 31:20-32:2, 32:11-16, Exh. I, 26:24-27:1, Exh. L, 10:3-5, 16:18-17:3, 18:9-14, 33:13-34:7, 35:5-8, Exh. M, 18:16-19:1, 27:5-24).

15. NSFD transported Harper to the hospital by ambulance. (Wirth Dec., ¶¶ 6, 9; Exh. F, 39:8-20, 42:7-9, Exh. I, 28:24-29:2),

16. SPD determined that the window Harper fell from belonged to Apartment 10. (Wirth Dec., ¶¶ 8-9, 11; Exh. H, 4-5, Exh. I, 32:13-23, Exh. K, 57:1-8, 60:4-19).

17. SPD was allowed entry into the apartment building and proceeded upstairs to Apartment 10. (Wirth Dec., ¶ 9; Exh. I, 31:19-32:23).

18. SPD officers knew that another person, Marciniak, lived in the same apartment and had suffered a heroin overdose on the premises three days earlier. (Wirth Dec., ¶¶ 8-9, 11, 17-18; Exh. H, p. 5, Exh. I, 35:8-37:18, 95:15-24, Exh. K, 49:8-24, Exh. Q, 53:20-54:10, Exh. R, 58:14-17, 59:8-13).

19. SPD officers also knew that SPD had responded to a domestic disturbance call to the same apartment between Harper and Marciniak a few weeks earlier. (Wirth Dec., ¶¶ 11,

17-18; Exh. K, 43:17-18, 44:12-16, Exh. Q, 53:20-54:4, Exh. R, 34:15-25, 35:18-37:1)

20. Neighbors told police that Harper and Marciniak had previously had loud altercations. (Wirth Dec., ¶¶ 6, 9, 11; Exh. F, 33:2-20, Exh. I, 34:20-35:2, 93:17-20, Exh. K, 67:4-10).

21. Harper later admitted that he and Marciniak had loud arguments that were probably overheard by their neighbors. (Wirth Dec., ¶ 3; Exh. C, 30:19-31:14).

22. The SPD attempted entry into Apartment 10 to conduct a welfare check by announcing their presence multiple times, banging loudly on both doors of the residence, and ringing the apartment's buzzer for approximately one minute. They did not receive a response. (Wirth Dec., ¶¶ 9, 11, 14; Exh. I, 31:19-32:1, 33:3-24, 92:15-17, Exh. K, 64:17-22, 65:17-19, Exh. N, 26:9-27:2).

23. Sgt. Smith, Off. Smith, and Taraboi determined entry should be accomplished to Apartment 10 of 4422 North Oakland Avenue out of concern for the safety of anyone inside. (Wirth Dec., ¶¶ 9, 11, 18; Exh. I, 35:3-8, 37:19-38:14, 93:1-15, Exh. K, 63:14-22, 66:24-67:10, 69:8-11, Exh. R, 55:15-22, 59:8-24).

24. Forcible entry into the apartment was accomplished by the NSFD. (Wirth Dec., ¶¶ 9, 14, 18; Exh. I, 38:15-20, Exh. N, 22:22-23:9, 24:12-18, Exh. R, 55:15-18, 60:6-18).

25. Sgt. Smith, Off. Smith, and Taraboi entered Apartment 10. (Wirth Dec., ¶ 9; Exh. I, 38:23-39:1).

26. Marciniak was found unconscious and naked on the bed, near the window that Harper had fallen out of. (Wirth Dec., ¶¶ 9, 11, 14, 18; Exh. I, 39:22-40:5, Exh. K, 70:8-9, Exh. N, 30:10-12, Exh. R, 63:24-64:6).

27. There was a piece of broken glass on Marciniak's back. (Wirth Dec., ¶ 9; Exh. I, 46:6-8).

28. Marciniak did not appear to be injured. (Wirth Dec., ¶ 9; Exh. I, 48:7-11).

29. NSFD paramedics and EMTs assessed Marciniak and checked his vitals, noting that he was groggy, but not agitated or distraught, and did not make any suicidal statements. (Wirth Dec., ¶¶ 8, 11, 14, 19; Exh. H, p. 6-7, Exh. K, 73:4-8, Exh. N, 7:10-17, 30:10-31:16, 32:15-20, 33:10-35:1, 35:15-21, 37:8-12, 40:4-12, 67:21-23, 94:23-95:4).

30. Marciniak refused any medical treatment from NSFD and refused transport to the hospital. (Wirth Dec., ¶¶ 6, 14; Exh. F, 41:25-42:6, Exh. N, 7:10-17, 40:4-41:6, 43:22-44:8, 47:1-7).

31. Marciniak appeared to be under the influence of alcohol and/or drugs, but he was not intoxicated to an extent that required involuntary treatment. (Wirth Dec., ¶¶ 9, 11, 14, 18; Exh. I, 17:19-19:19, 53:23-25, Exh. K, 80:12-18, Exh. N, 7:10-17, 92:15-93:19, Exh. R, 81:18-82:5).

32. Marciniak was appropriately answering questions so NSFD determined he was competent to refuse hospital transport. (Wirth Dec., ¶ 14; Exh. N, 7:10-17, 40:4-41:6, 44:9-11, 45:14-46:25, 80:10-81:9, 83:19-84:7, 94:7-14).

33. NSFD released Marciniak from their care into the hands of the SPD. (Wirth Dec., ¶¶ 14, 18; Exh. N, 7:10-17, 70:3-7, 83:8-14, 93:20-23, 94:2-6, Exh. R, 26:13-27:12, 155:9-17).

34. Sgt. Smith generally relied on NSFD's professional judgment in medically clearing intoxicated arrestees or detainees. (Wirth Dec., ¶ 18; Exh. R, 28:17-29:19).

35. Taraboi gave Marciniak some clothing and underwear that he found in the bedroom. Marciniak chose not to put the underwear on. (Wirth Dec., ¶ 9; Exh. I, 48:21-49:10).

36. Marciniak told Officer Taraboi that he'd had a couple drinks and that he did not remember having an argument with Harper. (Wirth Dec., ¶ 9; Exh. I, 49:12-50:6, 53:9-12).

37. The bedroom where Marciniak was found and that Harper had fallen from was disheveled, and police found two broken drinking glasses, broken glass and spots of blood on the bed, spots of blood a piece a mail next to the open window, and the screen had been removed from the window. (Wirth Dec., ¶¶ 9, 11, 18, 20-22; Exh. I, 42:15-20, 43:3-46:10, 97:8-14, Exh. K, 70:11-13, 71:13-22, 72:13-20, 87:5-8, 89:5-8, Exh. R, 63:12-16, Exh. T, p. 14-16, Exh. U, Exh. V Search Warrant Photos 23, 28-33, 36-39, 45-46, 53-64)

38. Sgt. Smith also recalled that the mattress was askew or separated from the box spring, and that there was a broken lamp. (Wirth Dec., ¶ 18; Exh. R, 63:13-23, 147:3-10).

39. The condition of the bedroom indicated to police that there had been a fight or physical altercation. (Wirth Dec., ¶¶ 9, 11, 17-18; Exh. I, 46:25-47:4, 97:23-25, 101:15-17, Exh. K, 70:11-21, 71:10-12, 72:3-4, Exh. Q, 82:18-83:3, Exh. R, 62:12-18, 66:2-11).

40. Harper stated that, when he was later able to regain access to his apartment, both he and his mother acknowledged that the state of the bedroom looked like there had been a struggle. (Wirth Dec., ¶ 3; Exh. C, 78:10-24, 79:20-24).

41. Sgt. Smith contacted Liebenthal, who was not at the scene, to advise him of the situation, including the state of the bedroom and Harper's condition. (Wirth Dec., ¶¶ 17-18; Exh. Q, 48:19-52:11, 52:25-54:10, 78:2-11, Exh. R, 71:21-72:3).

42. Sgt. Smith also informed Lt. Liebenthal that Marciniak appeared to be intoxicated but that he had been evaluated and cleared by EMTs and paramedics with the NSFD. (Wirth Dec., ¶¶ 17-18; Exh. Q, 51:2-4, Exh. R, 71:21-72:3; Declaration of Thomas Liebenthal, ¶¶ 4-6).

43. Liebenthal and Taraboi relied on NSFD's professional medical judgment that it was safe

to take Marciniak into custody. (Wirth Dec., ¶ 17; Exh. Q, 112:13-23, 113:10-15; Liebenthal Dec., ¶ 7; Declaration of Nicholas Taraboi, ¶ 3).

44. Liebenthal advised Sgt. Smith to detain Marciniak and transport him to the SPD station to be interviewed by a detective while they investigated whether other crimes in addition to domestic abuse, under Wis. Stat. § 968.075(1), had occurred. (Wirth Dec., ¶¶ 9, 17-18; Exh. I, 102:6-15, Exh. Q, 52:25-53:10, Exh. R, 71:21-72:3).

45. Based on the condition of the bedroom, the fact that Harper and Marciniak were current or former roommates, Harper's fall from a fourth-story window and severe injuries, neighbors hearing Harper yelling for help, Marciniak's proximity to the window from which Harper fell, the relative lack of injury to Marciniak, Marciniak's apparently intoxicated condition, neighbors' reports that Harper and Marciniak had previously had loud altercations, and the prior domestic disturbance call between Marciniak and Harper, police determined they had probable cause to arrest Marciniak. (Wirth Dec., ¶¶ 9, 17-18; Exh. I, 47:25-48:11, 50:21-51:2, 61:15-17, 96:9-98:1, 99:4-18, 101:3-17, Exh. Q, 50:8-52:11, 52:25-53:14, Exh. R, 65:24-66:7, 70:19-71:2, 76:6-18).

46. The decision to arrest Marciniak was also influenced by the fact that Wisconsin's domestic abuse statute, Wis. Stat. § 968.075, states that arrest is mandatory if the specified statutory factors are met. (Wirth Dec., ¶¶ 9, 17-19; Exh. I, 99:14-18, Exh. Q, 84:13-21, Exh. R, 69:7-16, Exh. S, 36:6-19).

47. Marciniak was arrested under Wisconsin's domestic abuse statute, Wis. Stat. § 968.075. (Wirth Dec., ¶¶ 9, 17, 19; Exh. I, 50:18-24, Exh. Q, 82:18-83:3, Exh. S, 36:6-19).

48. Other possible charges for Marciniak included battery, reckless endangerment, attempted homicide, all the way up to homicide, depending on whether Harper survived his injuries.

(Wirth Dec., ¶¶ 9, 17, 19; Exh. I, 50:18-51:2, Exh. Q, 53:2-8, 75:16-76:6, Exh. S, 51:12-16).

49. Sgt. Smith removed Marciniak from the apartment and directed Taraboi to arrest Marciniak and transport him to the SPD station, which Taraboi did. (Wirth Dec., ¶ 9; Exh. I, 90:19-91:9).

50. After Harper had been transported from the arrest scene by ambulance, Sgt. Smith sent Officer Rogers to the hospital to interview him because Harper's incoherent condition at the scene prevented him from giving a statement to police. (Wirth Dec., ¶ 18; Exh. R, 56:16-18, 57:1-8).

51. Harper told Officer Rogers that "his 'roommate' didn't do anything," but when pressed for details Harper said "he didn't want to talk at that time[.]" (Wirth Dec., ¶ 16; Exh. P, ¶ 6).

52. Harper does not remember giving any such statement to Officer Rogers. (Wirth Dec., ¶ 3; Exh. C, 60:25-62:10).

53. Officer Rogers updated Sgt. Smith from the hospital, but Sgt. Smith does not remember when this conversation occurred. (Wirth Dec., ¶ 18; Exh. R, 57:9-58:13).

54. Rogers does not know when he talked to Harper or when he updated Sgt. Smith. (Wirth Dec., ¶ 16; Exh. P, ¶¶ 26-27).

55. Rogers does not remember if he told Sgt. Smith that Harper said that Marciniak "didn't do anything." (Wirth Dec., ¶ 16; Exh. P, ¶ 27).

56. The West Allis Police Department Incident Report that Officer Rogers bases significant parts of his declaration on shows that he stated that he "updated" Sgt. Smith before Harper told him that his "'roommate' didn't do anything[.]" (Wirth Dec., ¶ 23; Exh. W,

p. 28).

57. Upon a call for aid made by Sgt. Smith, two officers from the University of Wisconsin-Milwaukee ("UWM") police department came to assist Taraboi as he booked Marciniak into the SPD municipal lockup. (Wirth Dec., ¶¶ 8-9, 18, 24; Exh. H, p.7, Exh. I, 65:16-18, 113:8-20, Exh. R, 79:15-22, Exh. X, 17:14-18:17).

58. Upon arrival at the SPD station, Taraboi and UWM Officer Kyle Gerasch, a male, accompanied Marciniak from the squad car to an interview room inside the SPD station, while UWM Officer Sara Lagerman (n.k.a. Sara Heim, "Heim"), a female, followed a short distance behind them. (Wirth Dec., ¶¶ 9, 24-25; Exh. I, 65:16-21, 66-14:18, Exh. X, 23:16-19, 25:13-16, 28:13-18, 42:5-13, Exh. Y, 4:9-11, 25:21-26:4, 29:4-14, 38:2-7, 39:24-40:4).

59. During the short walk from Taraboi's squad car to the interview room, Marciniak's shorts sagged a little. (Wirth Dec., ¶ 9; Exh. I, 66:19-67:1).

60. Because Marciniak had refused to put on underwear at the apartment, Taraboi briefly saw some of Marcniak's "private areas," specifically the top of his buttocks and the top of his pelvic area, when his shorts dropped. (Wirth Dec., ¶ 9; Exh. I, 66:24-25).

61. Taraboi grabbed Marciniak's shorts by the waistband and held them up while they walked the rest of the way to the interview room to prevent them from falling again. (Wirth Dec., ¶¶ 9, 24; Exh. I, 67:7-9, Exh. X, 47:19-23).

62. The two UWM officers present never saw Marciniak's buttocks and/or anus, pelvic area, genitals, or pubic area. (Wirth Dec., ¶¶ 24-25; Exh. X, 31:22-32:7, 47:19-48:4, 49:5-10, 50:11-14, 58:9-12, 63:23-64:12, 68:9-69:3, Exh. Y, 34:10-23, 61:7-13, 71:20-24, 80:9-16).

63. Officer Taraboi did not pull Marciniak's shorts down at any time, nor did he ever instruct that they be pulled down. (Taraboi Dec., ¶ 5).

64. Officer Taraboi did not touch Marciniak's uncovered genitals, pubic area, buttocks and/or anus at any time. (Taraboi Dec., ¶ 6).

65. Once in the interview room, Officer Taraboi conducted a custodial pat-down search of Marciniak, which was both a search incident to arrest and a standard custodial intake search, that lasted 3-4 minutes. (Wirth Dec., ¶¶ 9, 24-25; Exh. I, 68:10-12, 68:25-69:2, 70:13-15, Exh. X, 52:6-17, Exh. Y, 65:16-66:20, 68:1-14, 72:16-18).

66. SPD policy required that prisoners be searched at intake for weapons or contraband prior to being placed in a lockup cell. (Wirth Dec., ¶¶ 26-27; Exh. Z, p. 4, 6-7, Exh. AA, p. 1-2).

67. SPD had this policy in place because of concerns for safety and security of the institution, officers, detainees, contractors, and the public. (Wirth Dec., ¶ 27; Exh. AA, p. 1).

68. The two UWM officers present did not conduct the search: Gerasch was holding Marciniak's hands to prevent him striking Taraboi, while Heim was posted at the door threshold of the interview room. (Wirth Dec., ¶¶ 9, 24-25; Exh. I, 68:13-19, Exh. X, 52:22-54:18, Exh. Y, 65:16-66:3, 68:15-69:7).

69. Marciniak's shorts did not fall down during the custodial pat-down search. (Wirth Dec., ¶¶ 9, 24-25; Exh. I, 68:3-70:18, Exh. X, 57:14-24, Exh. Y, 71:5-10).

70. After the search, Sgt. Smith and Taraboi placed Marciniak in one of SPD's municipal lockup cells. (Wirth Dec., ¶ 9; Exh. I, 72:18-22).

71. SPD Chief Peter Nimmer did not permit SPD officers to hold arrestees in the interview room. (Wirth Dec., ¶¶ 18-19; Exh. R, 16:21-17:9, 87:8-14, Exh. S, 46:17-47:13, 90:24-

91:4).

72. There was no material change in Marciniak's condition or his behavior between the time of his arrest and the time he was placed in a cell in SPD's municipal lockup that would have alerted officers that Marciniak required medical and/or mental health care. (Wirth Dec., ¶¶ 24-25; Exh. X, 69:4-20, 70:1-5, 76:2-12, Exh. Y, 35:3-15, 36:14-17, 39:7-16, 57:7-10, 58:23-59:13, 71:25-72:9, 93:8-94:3).

73. Once Marciniak was inside the cell, Taraboi and Sgt. Smith asked Marciniak questions to complete his booking sheet and the health screening form. (Wirth Dec., ¶¶ 9, 18, 23, 28; Exh. I, 74:5-17, 75:8-76:23, 81:7-12, 83:13-22, Exh. R, 83:13-17, 89:3-9, 95:1-23, Exh. W, p. 3-4, Exh. BB)

74. Taraboi did not write Marciniak's charges on the booking sheet because SPD was still investigating the exact charges that would be recommended to the district attorney's office. (Wirth Dec., ¶¶ 9, 17, 28; Exh. I, 50:21-51:2, 77:18-21, Exh. Q, 107:19-22, Exh. BB, p. 1).

75. It is not unusual for the booking sheet not to immediately list an arresting officer or charges because these items will be filled in prior to a detainee's transport to the Milwaukee County Jail. (Wirth Dec., ¶¶ 9, 17-19; Exh. I, 78:23-79:17, Exh. Q, 102:20-104:5, 104:24-105:9, 105:25-107:13, Exh. R, 93:6-13, Exh. S, 48:14-49:7, 50:25-51:7).

76. The questions on the health screening form help alert officers to a detainee's potential medical or mental health issues. (Wirth Dec., ¶¶ 9, 17-19; Exh. I, 82:15-21, Exh. Q, 110: 4-12, Exh. R, 21:15-19, Exh. S, 52:22-53:2).

77. On Marciniak's health screening form, "yes" answers were checked for the boxes indicating that Marciniak appeared to be under the influence of alcohol and drugs and to

indicate that Marciniak had prior psychiatric treatment. (Wirth Dec., ¶ 28; Exh. BB, p. 2).

78. Marciniak did not appear to be overly depressed, anxious, or upset and he was not distraught. (Wirth Dec., ¶¶ 9, 18; Exh. I, 84:22-24, Exh. R., 116:17-117:5).

79. Marciniak denied being sick or injured, being on any prescription medication, currently being under a doctor's care, or having been hospitalized in the past year. (Wirth Dec., ¶ 28; Exh. BB, p. 2).

80. Marciniak told Officer Taraboi and Sgt. Smith that he was not suicidal; Marciniak did not make any suicidal statements or remarks. (Wirth Dec., ¶¶ 9, 18, 24, 28; Exh. I, 84:22-24, Exh. R, 95:7-23, 102:14-15, Exh. X, 76:2-12 Exh. BB, p. 2).

81. Marciniak refused to sign the booking sheet. (Wirth Dec., ¶¶ 9, 28; Exh. I, 80:5-15, Exh. BB, p. 1).

82. Lt. Liebenthal was not present at the SPD station at any time that Marciniak was there and did not have any personal interaction or contact with Marciniak at either his arrest or booking on August 15, 2016. (Wirth Dec., ¶ 17; Exh. Q, 103:3-4; Liebenthal Dec., ¶ 3).

83. Once Sgt. Smith took over Marciniak's booking process, Sgt. Smith instructed Officer Taraboi to return to the apartment building scene to retrieve a cell phone video of Harper's fall taken by an across-the-street neighbor. (Wirth Dec., ¶¶ 9, 18; Exh. I, 105:12-25, Exh. R, 52:18-21, 129:5-12).

84. The cell phone recording begins with Harper already hanging from the window before he eventually fell. (Wirth Dec., ¶ 20; Exh. T, p. 7, 11).

85. No officer who viewed the cell phone video at the apartment scene on the witness's phone could see much and they could not hear anything other than Harper yelling for help or saying "pull me into the house" and then a thud when he hit the ground. (Wirth

Dec., ¶¶ 9, 11, 16; Exh. I, 108:24-110:20, 111:14-23; Exh. K, 40:10-41:12, 42:9-17, 76:12-17, 77:5-6, Exh. P, ¶ 6).

86. Officer Smith viewed the cell phone video at the scene and would have informed other on-scene officers that the video was hard to see and that all he could hear was someone screaming for help. (Wirth Dec., ¶ 11; Exh. K, 42:2-43:4).

87. Sgt. Smith did not view the cell phone video but was aware that it showed a person hanging out of the window and yelling at someone inside. (Wirth Dec., ¶ 18; Exh. R, 50:14-51:3, 52:15-53:17, 129:5-8).

88. Liebenthal did not view the cell phone video. (Wirth Dec., ¶ 17; Exh. Q, 65:17-19).

89. Marciniak's condition or behavior during the time that he was in a cell in SPD's municipal lockup did not indicate that he was at risk for suicide. (Wirth Dec., ¶ 18; Exhibit R, 114:7-10).

90. Sgt. Smith's duties included regular welfare checks on detainees. (Wirth Dec., ¶ 18; Exh. R, 23:15-25, 94:1-4).

91. During his detainment, Marciniak was banging on his cell, making so much noise that it was interfering with Sgt. Smith's work on that busy night, so Sgt. Smith attempted to calm Marciniak down. (Wirth Dec., ¶ 18; Exh. R, 102, 7-12, 103:3-104:15, 105:6-19, 114:3-6, 137:11-15).

92. Marciniak told Sgt. Smith that he just wanted to go home. (Wirth Dec., ¶ 18; Exh. R, 102:14-15, 105:20-106:2).

93. Sgt. Smith performed visual welfare checks on Marciniak at or around 2:54 a.m., 3:12 a.m., 3:16 a.m., 3:23 a.m., 3:33 a.m., and 4:19 a.m. (Wirth Dec., ¶ 18, 23, 29; Exh. R, 96:6-15, 100:24-101:10, Exh. W, p. 3-5, Exh. CC, p. 65-66).

94. Although the time between the 3:33 a.m. check and the 4:19 a.m. check exceeded the SPD internal policy of performing welfare checks every 30 minutes, the frequency of *all* of Sgt. Smith's welfare checks on Marciniak were in accord with the "once per hour" state law enforcement standards. (Wirth Dec., ¶ 18, 23, 29; Exh. R, 96:6-15, 100:24-101:10, Exh. W, p. 3-5, Exh. CC, p. 65-66); Wis. Adm. Code. DOC § 349.12.

95. When Sgt. Smith went to check on Marciniak at 4:19 a.m., he discovered that Marciniak had hanged himself in his cell with his t-shirt. (Wirth Dec., ¶¶ 18, 23; Exh. R, 117:14-118:3, 118:25-119:23, Exh. W, p. 3-5).

96. Sgt. Smith immediately opened the cell, cut Marciniak down, radioed and yelled for help, and within minutes CPR was being performed and NSFD paramedics (who shared the building with the SPD at that time) were providing aid. (Wirth Dec., ¶¶ 13, 18, 23; Exh. M, 6:18-23, 28:22-29:6, 29:21-30:8, 31:13-32:5, 33:1-36:17, 37:19-38:24, Exh. R, 117:21-118:3, 118:25-119:12, 119:21-23, 120:13-121:2, Exh. W, p. 5-6).

97. Marciniak was transported to the hospital where he died several days later on August 21, 2016. (Wirth Dec., ¶ 29; Exh. CC, p. 3, 53).

98. Sgt. Smith did not modify the sheet documenting the times of his checks on Marciniak until after medical personnel responded to Marciniak in his cell. (Wirth Dec., ¶ 18; Exh. R, 120:2-9).

99. Sgt. Smith has never reviewed the footage of the security video showing the hallway in the SPD municipal lockup area. (Wirth Dec., ¶ 18; Exh. R, 89:14-24).

100. The Milwaukee County Investigative Team ("MCIT") then took over the investigation into the in-custody critical incident and the domestic abuse. (Wirth Dec., ¶ 29; Exh. CC, p. 1, 58-59).

101. MCIT Investigators downloaded the cell phone video from the witness's phone, copied the video onto a DVD, and played it on AV equipment at a police station. (Wirth Dec., ¶¶ 20, 23; Exh. T, p. 6-7, Exh. W, p. 6-7).

102. Only after taking these steps were MCIT investigators able to hear Harper on the video state "Wake your fucking ass up and pull me into the fucking house." (Wirth Dec., ¶ 20; Exh. T, p. 6-7).

103. On August 17, 2016, two days after Marciniak hanged himself, SPD Officer Andrew Rekuski wrote a report memorializing an interview he had conducted of Harper on August 13, 2016. (Declaration of Andrew S. Rekuski, ¶¶ 2-5, 14-15, Exh. A; Wirth Dec., ¶ 19; Exh. S, 19:5-20:10).

104. Officer Rekuski collected Harper's statement on August 13, 2016, as part of a follow-up investigation into Marciniak's heroin overdose on August 12, 2016. (Rekuski Dec., ¶¶ 3-7, 15, Exh. A, p. 1-2).

105. Officer Rekuski's report reflects that Harper asked for an investigation into the person who sold Marciniak the heroin that he overdosed on. (Rekuski Dec., ¶¶ 3-6, 15, Exh. A, p. 2).

106. Officer Rekuski's report also shows that Harper stated that Marciniak had mental illnesses including depression and had attempted suicide in the past. (Rekuski Dec., ¶ 15, Exh. A, p. 3).

107. However, during the 11 months that Harper and Marciniak had lived together, Harper was not aware of Marciniak exhibiting any self-harm or suicidal behavior. (Wirth Dec., ¶ 3; Exh. C, 25:7-10, 26:21-27:7).

108. Harper did not believe that Marciniak was suicidal in August of 2016, and did not

believe that Marciniak's drug use increased his presentation of depressive symptoms. (Wirth Dec., ¶ 3; Exh. C, 43:15-44:8).

109.	After taking Harper's statement and performing some follow-up investigation, Rekuski's shift was over. (Rekuski Dec., ¶¶ 9-10, 15, Exh. A, p. 5).

110.	The next day, August 14, 2016 was Officer Rekuski's regularly-scheduled day off. (Rekuski Dec., ¶ 11).

111.	Officer Rekuski did not return to the SPD station until sometime after 7:30 p.m. on August 15, 2016, when he was called in to assist on investigations into Marciniak's suicide and another case. (Rekuski Dec., ¶ 12).

112.	Officer Rekuski did not verbally inform anyone of the content of his interview with Harper before returning to work on the evening of August 15, 2016, hours after Marciniak had already hanged himself. (Rekuski Dec., ¶ 13; Wirth Dec., ¶ 19, Exh. S, 20:11-19, 21:14-23).

Dated this 1st day of February, 2020.

> SCHMIDT &WIRTH LAW OFFICES
> Attorneys for the Village of Shorewood, Thomas Liebenthal, Cody J. Smith, and Nicolas Taraboi
>
> /s/ electronically signed Joseph M. Wirth
> JOSEPH M. WIRTH
> State Bar No.: 1012080

P.O. Address:
788 N. Jefferson Street
Suite 500
Milwaukee, WI 53202-4620
Telephone: (414) 225-4060
Fax: (414) 271-6196
jmw@piperschmidt.com