UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

IZARIAH JUMP, and
ESTATE OF JONAH MARCINIAK,
by Special Administrator, Brenda Mroch

      Plaintiffs,

  and

DEAN HEALTH PLAN, INC.,

      Involuntary Plaintiff,          Magistrate Judge Nancy Joseph

v.                                        Case No.: 19-CV-1151

VILLAGE OF SHOREWOOD,
THOMAS LIEBENTHAL,
CODY J. SMITH, and
NICHOLAS TARABOI,

      Defendants.

---

### PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

---

### INTRODUCTION

      This civil rights case, brought pursuant to 42 U.S.C. § 1983, involves the wrongful death of Jonah Marciniak ("Jonah"), who hung himself in the Shorewood Police Department ("SPD") lockup after having been falsely arrested by Defendant SPD Sergeant Cody Smith, Defendant SPD Officer Nicholas Taraboi and Defendant SPD Lieutenant Thomas Liebenthal ("Defendants").

      On August 15, 2016, Jonah's friend and roommate, Eric Harper ("Eric"), accidentally fell from the fourth story window of his apartment building, seriously injuring himself. Jonah was in

the apartment when Eric fell out of the window. A neighbor witnessed Eric hanging out of and falling from the window, recorded it on her cell phone, and her husband called 911 to report the accident. Defendants Smith, Taraboi, and other SPD officers responded to the scene, but instead of conducting a reasonable investigation, which would have revealed that no crime had occurred, they arrested Jonah, based on scant suspicion and a mere assumption that Jonah was responsible for Eric falling out of the window.

The crux of Plaintiffs' claims is that Defendants arrested Jonah without probable cause and then failed to properly monitor him in the police lockup despite being on notice that he was a suicide risk, thereby causing his death. Plaintiffs have moved for partial summary judgment against Defendants Smith, Taraboi and Liebenthal on their false arrest claim on the basis that the undisputed facts establish that Jonah was arrested without probable cause in violation of his Fourth Amendment rights.

**SUMMARY OF FACTS PERTINENT TO THE FALSE ARREST CLAIM**

In August of 2016, Jonah Marciniak lived at 4422 North Oakland Avenue, Apartment 10 in the Village of Shorewood with Eric Harper. (Plaintiffs' Statement of Proposed Material Facts ("PSPMF") ¶ 1). In the early morning hours of August 15, 2016, a neighbor of Jonah and Eric named Bruce Hoover heard a male voice screaming. (PSPMF ¶ 2). Mr. Hoover spoke to his wife Tatiana Hoover, who told him to call the police because she saw someone fall from the building located at 4422 North Oakland Avenue. (PSPMF ¶ 3). Mr. Hoover went outside and found a man lying on the grass outside of the building located at 4422 North Oakland Avenue. (PSPMF ¶ 4).

At 1:34 a.m., Mr. Hoover called 911 to report that a man had fallen out of a third or fourth story window of an apartment building at 4422 North Oakland Avenue. (PSPMF ¶ 5). While relaying information about the man falling from the window, Mr. Hoover told the 911

2

operator that his wife "saw it happen." (PSPMF ¶ 6). At no point during the 911 call did Mr. Hoover report a domestic abuse incident or that any other crime had occurred. (PSPMF ¶ 7). Mr. Hoover went back inside his residence and learned that his wife had recorded the incident on her cell phone. (PSPMF ¶ 8).

Ms. Hoover's cell phone recording of the incident is two minutes and five seconds long. (PSPMF ¶ 9). Very little is visible on the recording of the incident due to it being recorded at night, but the recording does contain intelligible audio. (PSPMF ¶ 10). At approximately 53 seconds into the cell phone recording, the same male voice states, "wake your fucking ass up and pull me into the fucking house." (PSPMF ¶ 11). The same male voice in the video then can be heard stating, "Jonah, pull me into the house, Jonah, Jonah." (PSPMF ¶ 12). At approximately one minute and 20 seconds into the recoding, the same male voice becomes louder as he starts yelling, "help me, help me now, pull me back into the house, Jonah, Jonah, pull me back into the fucking house, Jonah, Jonah." (PSPMF ¶ 13). At one minute and 58 seconds into the recording, the same male voice is heard stating "oh my God," then two loud bangs can be heard. (PSPMF ¶ 14). Only one voice is ever heard on the cell phone recording, which increases in volume before the sound of a fall, there is no video or audio in the cell phone recording of anyone being violent toward the man, or any crime occurring. (PSPMF ¶ 15).

At 1:35 a.m., a dispatch call to SPD officers instructed them to respond to the 4400 block of Oakland Avenue "for a male subject that fell out of a fourth story window." (PSPMF ¶ 16). There is nothing in this dispatch call to SPD officers stating that domestic violence or any other crime was suspected or had occurred. (PSPMF ¶ 17). At 1:35 a.m., Defendant SPD Sergeant

3

Cody Smith, Defendant SPD Officer Nicholas Taraboi, and SPD Officers Theron Rogers and Cody Smith[1] responded to the dispatch call. (PSPMF ¶ 18).

When the SPD officers arrived on scene, they found a male lying on the ground (later determined to be Eric Harper) who appeared to have fallen from a window. (PSPMF ¶ 20). Members of the North Shore Fire Department arrived on the scene within a minute of the SPD officers. (PSPMF ¶ 21). Defendants Smith and Taraboi observed Eric speaking with members of the North Shore Fire Department but do not know or cannot recall what was said. (PSPMF ¶ 22). Defendant Smith directed SPD Officer Rogers to go to the hospital with Eric. (PSPMF ¶ 23). Defendant Taraboi, and Officer Smith decided to enter the building to do a welfare check in the apartment from which Eric fell. (PSPMF ¶ 24). Defendant Smith knew that there was cell phone recording of Eric falling out of the window, but Defendant Smith did not review the video prior to entering the building. (PSPMF ¶ 25). Defendant Smith believes that he directed Defendant Taraboi to retrieve the cell phone recording. (PSPMF ¶ 26).

Defendant Smith, Defendant Taraboi, and Officer Smith, along with two members of the North Shore Fire Department, entered the building and went to the apartment from which Eric fell, which was Apartment 10. (PSPMF ¶ 27). Defendant Smith, Defendant Taraboi and Officer Smith knocked loudly on the doors to Apartment 10, but there was no response. (PSPMF ¶ 28). Defendant Taraboi went downstairs and rang the buzzer for Apartment 10, while Defendant Smith and Officer Smith continued to bang loudly on the door, but they received no response. (PSPMF ¶ 29). Officer Smith spoke with a man who lived across the hall from Apartment 10, who stated that there were two men who were in an intimate relationship together that had lived there, that he believed one of the men had recently moved out, and that he had previously

---

[1] Officer Smith has the same name as the Defendant Sgt. Smith but is not a defendant in the case.

overhead loud arguments coming from the apartment, but had no knowledge of physical fights, including from that night. (PSPMF ¶ 30). Officer Smith mentioned to Defendant Smith and Defendant Taraboi that a few days earlier SPD officers responded to the same apartment building where Jonah had overdosed on heroin, was revived, and was taken either to the hospital or the Milwaukee County Mental Health Complex for treatment. (PSPMF ¶ 31). Defendant Smith, Defendant Taraboi, and Officer Smith decided to make a forced entry into Apartment 10 to check on the welfare of anyone who might be inside and to investigate any possible crime. (PSPMF ¶ 32).

The North Shore Fire Department forcibly opened the door to Apartment 10 using a sledgehammer and a prying tool, making loud noises as they did so. (PSPMF ¶ 33). Defendant Smith, Defendant Taraboi, and Officer Smith then entered Apartment 10, and found Jonah naked and lying face down on a bed in a bedroom. (PSPMF ¶¶ 34-35). He appeared to be asleep. (PSPMF ¶ 35). In the bedroom, Defendant Smith observed shards of broken glass toward the foot of the bed, that the bed was separated from the bed frame or box spring, and possibly a busted lamp or a pushed-in lamp shade. (PSPMF ¶ 36). Defendant Smith, Defendant Taraboi, and Officer Smith screamed commands at Jonah for him to show his hands, but Jonah did not move. (PSPMF ¶ 37). It appeared to Defendant Taraboi that Jonah had very shallow breaths. (PSPMF ¶ 38). Defendant Smith, Defendant Taraboi, and Officer Smith made numerous attempts to wake Jonah by screaming and yelling at him, but Jonah did not respond. (PSPMF ¶ 39). After the attempts to wake Jonah by screaming and yelling at him failed, Jonah was shaken and then rolled onto his back which was when Jonah woke up. (PSPMF ¶ 40).

After Jonah was rolled over, Defendant Taraboi saw two or three blood drops on the lower part of the bed where Jonah was laying. (PSPMF ¶ 41). Defendant Taraboi noticed two

5

broken glasses inside the bedroom, one on an end table and one in between the bed and the window out of which Eric fell, that the inside window screen had been removed from the window out of which Eric fell, and small shards of glass on Jonah and on the bed. (PSPMF ¶¶ 42-44). After Jonah woke up, Defendant Taraboi observed that Jonah was lethargic. (PSPMF ¶ 45).

When Jonah woke up, one of the North Shore Fire Department firefighters stated that he recognized Jonah from the recent overdose incident. (PSPMF ¶ 46). Defendant Taraboi checked Jonah for any visible injuries or other signs of him being involved in an altercation or fight, but Defendant Taraboi did not find any. (PSPMF ¶ 47). After Jonah woke up, he was lying on the bed for two or three minutes before he sat up. (PSPMF ¶ 48). Defendant Taraboi retrieved a t-shirt, a pair of shorts and underwear for Jonah to wear. (PSPMF ¶ 49). It took Jonah some time to put on the t-shirt and pair of shorts, and he did not put on the underwear. (PSPMF ¶ 50).

While they were in the bedroom, Defendant Taraboi asked Jonah what happened prior to him being woken up by the police and whether he was involved in any kind of argument with Eric. (PSPMF ¶ 51). Jonah responded that he had fallen asleep and did not remember being involved in any argument with Eric, and denied fighting with Eric. (PSPMF ¶ 52). Jonah also said he had a couple of drinks, and denied using heroin. (PSPMF ¶ 53). It appeared to Officer Smith that Jonah was intoxicated and that his speech was slurred. (PSPMF ¶ 54). Officer Smith heard Jonah asking: "Where is Eric?" (PSPMF ¶ 55). Defendant Smith and Defendant Taraboi decided to remove Jonah from the apartment and take him into the hallway. (PSPMF ¶ 56). In the hallway, Defendant Taraboi believes he heard Jonah ask where Eric was, and it appeared to Defendant Taraboi that Jonah was under the influence of alcohol or drugs. (PSPMF ¶¶ 57-58).

6

Defendant Smith and Defendant Taraboi then brought Jonah outside of the building while Officer Smith stayed behind in Apartment 10. (PSPMF ¶ 59).

After Jonah was taken outside of the building, Defendant Taraboi questioned Jonah further, and Jonah again denied that he fought with Eric. (PSPMF ¶ 60). It appeared to Defendant Taraboi that Jonah was confused as to what was going on, and that Jonah did not know what happened to Eric. (PSPMF ¶ 61). Defendant Smith then called his supervisor, Defendant SPD Lieutenant Thomas Liebenthal, to advise him of what the SPD officers found at the apartment building. (PSPMF ¶ 62). In response, Defendant Liebenthal stated to Defendant Smith: "Well, we should probably bring him in and call in a detective." (PSPMF ¶ 63). Defendant Smith instructed Defendant Taraboi to handcuff Jonah and transport him to the SPD police station. (PSPMF ¶ 64). Defendant Taraboi then handcuffed Jonah, placed him inside an SPD squad car, and transported him to the police station. (PSPMF ¶¶ 65, 70). No SPD officer read Jonah his *Miranda* rights. (PSPMF ¶ 69).

## ARGUMENT

### I. Summary Judgment Standard

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In determining the motion, the court construes all facts and reasonable inferences in a light most favorable to the nonmoving party. *Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005); *J.M. v. City of Milwaukee*, 249 F. Supp. 3d 920, 923 (E.D. Wis. 2017).

7

## II. The Fourth Amendment Probable Cause Standard

"Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart" as deprivation of the Fourth Amendment right to be free from unreasonable searches and seizures. *Brinegar v. United States*, 338 U.S. 160, 180 (1949) (Jackson, J., dissenting). Because "uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government," *id*., the Framers of the Constitution specifically provided that citizens shall be arrested only on probable cause. *See Beck v. Ohio*, 379 U.S. 89, 91 (1964).

"A police officer has probable cause to arrest an individual when the facts and circumstances that are known to him reasonably support a belief that the individual has committed, is committing, or is about to be commit a crime." *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007). "Probable cause requires more than bare suspicion of criminal activity, but it does not require evidence sufficient to support a conviction." *Id*.; *see also United States v. Ingrao*, 897 F.2d 860, 862-66 (7th Cir. 1990) ("While probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity, mere suspicion is not enough."); *United States v. Serna-Barreto,* 842 F.2d 965, 966 (7th Cir. 1988) (Posner, J.) ("An arrest is a profound and deeply resented interference with the liberty of the person, and to allow police to arrest people on anything less than a high degree of suspicion would restrict personal liberty more than has been justified by the needs of public security.").

To determine whether an officer had probable cause to arrest an individual, the court examines the events leading up to the arrest and then decides "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to" probable cause. *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (internal quotation and citation omitted).

The determination of whether probable cause exists in a particular situation involves examining the totality of the circumstances in a common sense manner. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983).

In evaluating probable cause, an officer may not unreasonably disregard certain pieces of evidence by choosing to ignore information that has been offered to him or her or electing not to obtain easily discoverable facts that might tend to exculpate a suspect. *See BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986) ("A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest. Reasonable avenues of investigation must be pursued especially when, as here, it is unclear whether a crime had even taken place."); *Moore v. Marketplace Rest., Inc.*, 754 F.2d 1336, 1345-1346 (7th Cir. 1985) ("it is incumbent upon law enforcement officials to make a thorough investigation and exercise reasonable judgment before invoking the awesome power of arrest and detention"); *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 305 (6th Cir. 2005) ("an officer cannot look only at the evidence of guilt while ignoring all exculpatory evidence. Rather, the officer must consider the totality of the circumstances, recognizing both the inculpatory and exculpatory evidence, before determining if he has probable cause to make an arrest.").

### III. Defendants Smith, Taraboi and Liebenthal Violated Jonah's Fourth Amendment Rights When They Arrested Him Without Probable Cause

Viewing the evidence in the light most favorable to Defendants, they did not have probable cause to believe that Jonah had committed a crime. Defendants claim they arrested Jonah for domestic abuse pursuant to Wis. Stat. § 968.075, which provides:

> "Domestic abuse" means any of the following engaged in by an adult person against his or her spouse or former spouse, against an adult with whom the person resides or formerly resided or against an adult with whom the person has a child in common:
>
> 1. Intentional infliction of physical pain, physical injury or illness.

    2. Intentional impairment of physical condition.
    3. A violation of s. 940.225(1), (2) or (3) (describing forms of sexual assault).
    4. A physical act that may cause the other person reasonably to fear imminent engagement in the conduct described under subd. 1, 2 or 3.

Defendants assert that the following information established probable cause for Jonah's arrest: (1) Eric had fallen out of the window and was injured; (2) the appearance of the bedroom, specifically, that there were blood droplets and glass fragments on the bed, the bed was separated from the box spring, there were two broken glasses in the bedroom, and possibly a broken lamp or a pushed-in lamp shade; and (3) the prior domestic disturbance call. (PSPMF ¶¶ 20, 36, 41-44, 66, 71).

While these facts, taken in the light most favorable to Defendants, gave rise to reasonable suspicion to briefly detain Jonah pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968) and to continue investigating, they did not cross the threshold into probable cause because none of the facts viewed separately or in conjunction were overtly incriminating or reasonably supported a belief that Jonah had committed the crime of domestic abuse. In assessing whether police had probable cause to arrest, "it is common and helpful for courts to consider possible innocent alternatives that might explain the facts before the agents," although "the mere existence of innocent explanations does not necessarily negate probable cause." *United States v. Funches*, 327 F.3d 582, 587 (7th Cir. 2003). Here, the fact that Eric fell out of the window and was injured could just as reasonably been an accident (which is how it was initially specifically reported to SPD officers) as a crime; common sense and experience show that people can accidentally fall out of a window when they are drunk or lose their balance, just as people can be pushed out of a window. Moreover, Jonah's mere presence in the bedroom, without more, should not have led Defendants to conclude that he had committed a crime. *See Williams v. City of Chi.*, 733 F.3d 749, 756 (7th Cir. 2013) ("Clearly physical proximity to a suspected crime, without other indicia

of . . . involvement, is insufficient to support a finding of probable cause.") (internal quotation and citation omitted). There is also nothing inherently incriminating about the condition of the bedroom; it is not particularly unusual for a bedroom to appear disheveled, and the fact that Defendants observed that Jonah was intoxicated would provide a plausible explanation for the bedroom being somewhat in disarray, including the broken glasses. The prior domestic disturbance call is also minimally probative since prior behavior alone does not establish reasonable grounds to believe that an individual is presently engaged in criminal conduct. *Beck*, 379 U.S. at 97. Thus, while some measure of suspicion reasonably attaches to these proffered facts, the degree of suspicion is minimal and does not give rise to probable cause that Jonah committed the crime of domestic abuse.

Furthermore, whether a reasonable officer could have believed he had probable cause to arrest "depends on the totality of the circumstances," *Pringle*, 540 U.S. at 371, which, in this case, include the following facts in addition to those discussed above: (1) the information Defendants received from dispatch was to respond "for a male subject that fell out of a fourth story window"—they had no information about domestic violence or any other crime having occurred (PSPMF ¶¶ 16-17); (2) no witness reported seeing or hearing Jonah and Eric arguing or fighting that night (PSPMF ¶¶ 17, 30); and (3) Jonah did not say or do anything incriminating in the presence of Defendants—he was lying in bed, naked and passed out, when they found him, he denied fighting with Eric, he kept asking, "where is Eric?," and it appeared to Defendant Taraboi that Jonah was confused as to what was going on and did not know what happened to Eric (PSPMF ¶¶ 35, 51-55, 60-61). It was incumbent on Defendants to have considered the totality of the circumstances, recognizing both the inculpatory and exculpatory evidence, before

11

determining if they had probable cause to arrest Jonah. These additional facts further negate a finding of probable cause.

Additionally, Defendants' decision to not obtain easily discoverable facts that would have further exculpated Jonah was unreasonable and weighs against a finding of probable cause. *See BeVier*, 806 F.2d at 128. Specifically, Defendants Smith and Taraboi knew, prior to entering the apartment building, that a neighbor not only witnessed Eric falling from the window, but had recorded it on her cell phone, yet they chose not to interview her or view the recording prior to arresting Jonah; had they done so, they would have heard, *inter alia*, Eric yelling "wake up" and "help me"—statements which are inconsistent with Eric being pushed out of the window. (PSPMF ¶¶ 9-13). Defendants also chose to arrest Jonah prior to interviewing Eric, the alleged victim, and without having any kind of statement from Eric incriminating Jonah, despite their knowledge that Eric spoke to Fire Department personnel and Officer Rogers accompanied Eric to the hospital. (PSPMF ¶¶ 20-23). These were all reasonable avenues of investigation that Defendants should have pursued, especially where it was unclear whether a crime had even taken place. *See BeVier*, 806 F.2 at 128. Their failure to do so weighs against a finding of probable cause.

Moreover, the fact that Jonah made no attempt to flee or leave the scene further undercuts a finding of probable case because, under Seventh Circuit precedent, "probable cause is a function of information and exigency." *BeVier*, 806 F.2d at 127. "[T]he amount of information that prudent police will collect before deciding to make a search or arrest, and hence the amount of probable cause they will have, is a function of the gravity of the crime, and especially the danger of its imminent repetition." *Id.* (quoting *Llaguno v. Mingey*, 763 F.2d 1560, 1567 (7th Cir. 1985)). While domestic abuse is a serious crime, Eric had been removed from the area and

taken to the hospital so that there was no threat of its imminent repetition if any abuse had in fact occurred.

. . .

In sum, summary judgment is appropriate here because the facts and totality of the circumstances within Defendants' knowledge, even when viewed in the light most favorable to them, were insufficient to warrant a reasonable officer in believing that Jonah had committed a crime.

### IV.     Defendants are Not Entitled to Qualified Immunity

Defendants have asserted the affirmative defense of qualified immunity, which "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). In evaluating qualified immunity, the court asks two questions: (1) whether the facts make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation. *Id.* at 232. "Because this is a false arrest claim, the second question can be framed as whether a reasonable officer could have mistakenly believed that probable cause existed," a concept that is often called 'arguable probable cause,'" which is sufficient to grant qualified immunity "to officers who reasonably but mistakenly believed they had probable cause to arrest." *Williams v. City of Chi.*, 733 F.3d 749, 758 (7th Cir. 2013) (internal quotations and citations omitted).

As explained in the previous section, the facts in this case, taken in the light most favorable to Defendants and set against clearly and long established Supreme Court and Seventh Circuit precedent, show not only a violation of Jonah's constitutional right to be free from arrest

13

without probable cause, but also that a reasonable officer could not have mistakenly believed that probable cause existed. Accordingly, qualified immunity should be denied.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for partial summary judgment.

Dated: February 1, 2021         Respectfully submitted,

/s/ Ben H. Elson
One of Plaintiffs' Attorneys

Ben H. Elson, Janine L. Hoft, Jan Susler       Jerome A. Konkel, Jeffrey Patza
PEOPLE'S LAW OFFICE                            SAMSTER, KONKEL & SAFRAN
1180 N. Milwaukee Ave.                         A division of Groth Law Firm, S.C.
Chicago, IL 60642                              11063 W. Bluemound Road
(773) 235-0070                                 Wauwatosa, WI 53226
                                               (414) 224-0200