## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

IZARIAH JUMP and
ESTATE OF JONAH MARCINIAK,
by Special Administrator, Brenda Mroch,

      **Plaintiffs,**

and

DEAN HEALTH PLAN, INC.,

      **Involuntary Plaintiff,**

      v.                              Case No.  19-CV-1151

VILLAGE OF SHOREWOOD,
THOMAS LIEBENTHAL,
CODY J. SMITH, and NICOLAS TARABOI,

      **Defendants.**

---

## DECISION AND ORDER ON DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' MOTION FOR
## PARTIAL SUMMARY JUDGMENT

---

Jonah Marciniak died by suicide while in the custody of the Village of Shorewood

Police Department ("SPD"). Marciniak's son, Izariah Jump, and Marciniak's estate sue the

Village of Shorewood and three employees of the SPD—Thomas Liebenthal, Cody J.

Smith, and Nicolas Taraboi—for damages pursuant to 42 U.S.C. § 1983 and Wisconsin law.

(Docket # 1.) The plaintiffs move for judgment in their favor on their false arrest claim,

arguing that the undisputed facts show that Marciniak was arrested without probable cause

in violation of his Fourth Amendment rights. (Docket # 38.) The defendants move for

judgment in their favor, dismissing the plaintiffs' complaint in its entirety. (Docket # 29.)

For the reasons explained below, the plaintiffs' motion for partial summary judgment is

denied and the defendants' motion for summary judgment is granted and the case is dismissed.

# FACTS

In August of 2016, Jonah Marciniak lived at 4422 North Oakland Avenue, Apartment 10 in the Village of Shorewood, with Eric Harper. (Pls.' Proposed Findings of Fact in Supp. of Partial Summ. Judg. ("PPFOF") ¶ 1, Docket # 40 and Defs.' Resp. to PPFOF ("Defs.' Resp.") ¶ 1, Docket # 55.) In the early morning hours of August 15, 2016, a neighbor of Marciniak and Harper named Bruce Hoover heard a male voice screaming. (*Id.* ¶ 2.) Hoover spoke to his wife, Tatiana, who told him to call the police because she saw someone fall from the building located at 4422 North Oakland Avenue. (*Id.* ¶ 3.) Bruce Hoover went outside and found a man lying on the grass outside of the building located at 4422 North Oakland Avenue. (*Id.* ¶ 4.) At 1:34 a.m., Bruce Hoover called 911 to report that a man had fallen out of a third or fourth story window. (*Id.* ¶ 5.) He told the 911 operator that his wife "saw it happen." (*Id.* ¶ 6.) Bruce Hoover went back inside his residence and learned that his wife had recorded the incident on her cell phone. (*Id.* ¶ 8.) The cell phone recording is two minutes and five seconds long. (*Id.* ¶ 9.)

At 1:35 a.m., a dispatch call was made to SPD officers instructing them to respond to the 4400 block of Oakland Avenue "for a male subject that fell out of a fourth story window." (*Id.* ¶ 16.) SPD Sergeant Cody Smith and Officers Taraboi, Theron Rogers, and Cody Smith[1] responded to the dispatch call. (*Id.* ¶ 18.) Sgt. Smith encountered Marciniak approximately two weeks prior when responding to a domestic violence incident at the same location. (*Id.* ¶ 19.) When the SPD officers arrived on scene, they found a male lying

---

[1] Officer Cody Smith is of no relation to Sgt. Cody Smith. Officer Smith is not a defendant in this case.

on the ground (later determined to be Eric Harper) who appeared to have fallen from an open window. (*Id.* ¶ 20.) Members of the North Shore Fire Department ("NSFD") arrived on the scene within a minute of the SPD officers. (*Id.* ¶ 21.)

Sgt. Smith, Officer Taraboi, and Officer Smith decided to enter the building to do a welfare check in the apartment from which Harper fell. (*Id.* ¶ 24.) Prior to entering the apartment, Sgt. Smith testified that he viewed the cell phone video taken by Tatiana Hoover. (Deposition of Cody Smith ("Smith Dep.") at 40, Docket # 45.) Sgt. Smith testified that the video was very hard to see and all that he could hear on the video was someone screaming for help and a "thud" sound indicating someone had fallen. (*Id.* at 41–42.) He further testified that he would have informed the other officers on the scene about what he had seen on the video. (*Id.* at 42.) Sgt. Smith, Officers Taraboi and Smith, and two members of the NSFD entered the building and went to check on the apartment from which Harper fell, which was Apartment 10. (*Id.* ¶ 27.)

Sgt. Smith and Officers Taraboi and Smith knocked loudly on both doors to Apartment 10, but there was no response. (*Id.* ¶ 28.) Officer Taraboi went downstairs and rang the buzzer for Apartment 10 while Sgt. Smith and Officer Smith continued to bang loudly on the door, but they received no response. (*Id.* ¶ 29.) Officer Smith spoke with a man who lived across the hall from Apartment 10, who stated that there were two men who were in an intimate relationship together that had lived there, that he believed one of the men had recently moved out, and that he had previously overhead loud arguments coming from the apartment. (*Id.* ¶ 30.)

Officer Smith mentioned to Sgt. Smith and Officer Taraboi that a few days earlier, SPD officers responded to the same apartment building where Marciniak had overdosed on

heroin, was revived, and was taken either to the hospital or the Milwaukee County Mental Health Complex for treatment. (*Id.* ¶ 31.) Sgt. Smith, Officer Taraboi, and Officer Smith decided to force entry into Apartment 10 to check on the welfare of anyone who might be inside. (*Id.* ¶ 32.) The NSFD forcibly opened the door to Apartment 10 using a sledgehammer and a prying tool, making loud noises as they did so. (*Id.* ¶ 33.)

Sgt. Smith, Officer Taraboi, and Officer Smith entered the apartment. (*Id.* ¶ 34.) Upon entering the apartment, they found Marciniak naked, lying face down on a bed in a bedroom. (*Id.* ¶ 35.) Sgt. Smith observed shards of broken glass on the bed, that the bed was separated from the bed frame or box spring, and a busted lamp. (*Id.* ¶ 36.) The officers screamed commands at Marciniak to show his hands, but Marciniak did not move. (*Id.* ¶ 37.) It appeared to Officer Taraboi that Marciniak's breaths were shallow. (*Id.* ¶ 38.) Sgt. Smith and Officers Taraboi and Smith made numerous attempts to wake Marciniak by screaming and yelling at him, but Marciniak did not respond. (*Id.* ¶ 39.)

After the attempts to rouse Marciniak failed, he was rolled onto his back, and possibly shaken, at which point he woke up. (*Id.* ¶ 40.) After Marciniak was rolled over, Officer Taraboi saw drops of blood on the lower part of the bed where Marciniak was lying. (*Id.* ¶ 41.) Officer Taraboi also saw two broken glasses inside the bedroom, one on an end table and one in between the bed and the widow out of which Harper fell. (*Id.* ¶ 42.) Officer Taraboi noticed that the inside window screen had been removed from the window out of which Harper fell and saw small shards of glass on Marciniak and the bed. (*Id.* ¶¶ 43–44.) After Marciniak awoke, one of the NSFD firefighters stated that he recognized Marciniak from the recent overdose incident. (*Id.* ¶ 46.) Officer Taraboi checked Marciniak for any visible injuries or other signs of an altercation or fight, but he did not find any. (*Id.* ¶ 47.)

4

After waking up, Marciniak lay on the bed for two to three minutes before sitting up. (*Id.* ¶ 48.) Officer Taraboi retrieved a t-shirt, a pair of shorts, and underwear for Marciniak to wear. (*Id.* ¶ 49.) It took Marciniak some time to put on the t-shirt and pair of shorts, but he did not put on the underwear. (*Id.* ¶ 50.) Officer Taraboi asked Marciniak what happened and whether he was involved in any kind of argument with Harper, to which Marciniak responded that he had fallen asleep and did not remember arguing with Harper. (*Id.* ¶¶ 51–52.) Marciniak stated that he had had a couple of drinks, but denied using heroin. (*Id.* ¶ 53.) It appeared to Officer Smith that Marciniak was intoxicated as his speech was slurred. (*Id.* ¶ 54.) Officer Smith heard Marciniak ask where Harper was. (*Id.* ¶ 55.) Sgt. Smith and Officer Taraboi decided to remove Marciniak from the apartment and take him into the hallway (*id.* ¶ 56); Marciniak was then brought outside of the building while Officer Smith stayed behind in the apartment (*id.* ¶ 59).

While outside, Sgt. Smith called his supervisor, Lt. Liebenthal, to advise him of what the SPD officers found inside the apartment building. (*Id.* ¶ 62.) Lt. Liebenthal told Sgt. Smith to bring Marciniak in and Sgt. Smith instructed Officer Taraboi to handcuff Marciniak and transport him to the SPD police station. (*Id.* ¶¶ 63–64.) Officer Taraboi, Sgt. Smith, and Lt. Liebenthal believed that Marciniak was under arrest as soon as he was handcuffed and placed in the SPD squad car. (*Id.* ¶¶ 66, 71–72.)

After Harper was transported from the arrest scene by ambulance to the hospital, Sgt. Smith sent Officer Rogers to interview him. (Defs.' Proposed Findings of Fact ("DPFOF") ¶ 50, Docket # 31 and Pl.'s Resp. to DPFOF ("Pl.'s Resp.") ¶ 50, Docket # 60.) Harper told Officer Rogers that Marciniak did not do anything, but did not want to discuss the details of the incident. (*Id.* ¶ 51.) Officer Rogers updated Sgt. Smith from the hospital, but Sgt. Smith

cannot remember when the conversation occurred. (*Id.* ¶ 53.) The West Allis Police Department incident report, however, states that Officer Rogers updated Sgt. Smith before Harper told him that Marciniak did not do anything. (*Id.* ¶ 56.)

Sgt. Smith called for assistance and two officers from the University of Wisconsin-Milwaukee ("UWM") police department came to assist Officer Taraboi with Marciniak. (*Id.* ¶ 57.) Upon arrival at the SPD station, Officer Taraboi and UWM Officer Kyle Gerasch accompanied Marciniak from the squad car to an interview room while UWM Officer Sara Lagerman followed a short distance behind them. (*Id.* ¶ 58.) During the short walk from Officer Taraboi's squad car to the interview room, Marciniak's shorts sagged. (*Id.* ¶ 59.) Because Marciniak was not wearing underwear, Officer Taraboi briefly observed some of Marciniak's "private areas," though the parties dispute exactly what he saw. (*Id.* ¶¶ 59–60.)[2] Officer Taraboi grabbed Marciniak's shorts by the waistband and held them up while they walked the rest of the way to the interview room to prevent them from falling down again. (*Id.* ¶ 61.) Officer Taraboi did not, however, pull Marciniak's shorts down at any time, nor did he ever instruct others to pull them down. (*Id.* ¶ 63.)

While inside the interview room, Officer Taraboi conducted a search of Marciniak that lasted three to four minutes. (*Id.* ¶ 65.) After the search, Sgt. Smith and Officer Taraboi placed Marciniak in one of the SPD's municipal lockup cells. (*Id.* ¶ 70.) A health screening form was completed, and the answer "yes" was checked for the boxes indicating that Marciniak appeared to be under the influence of alcohol and drugs and that he had prior psychiatric treatment. (*Id.* ¶ 77.) During his detainment, Marciniak was banging on his cell,

---

[2] While Officer Taraboi contends that he observed the top of Marciniak's buttocks and the top of his pelvic area (DPFOF ¶ 60), the plaintiffs counter that the video from the SPD interior parking garage shows Marciniak's shorts falling down to the point of revealing his pubic area and pubic hair (Pls.' Resp. to DPFOF ¶ 59).

6

making so much noise that it was interfering with Sgt. Smith's work, so Sgt. Smith attempted to calm Marciniak down. (*Id.* ¶ 91.) Sgt. Smith performed visual welfare checks on Marciniak at or around 2:54 a.m., 3:12 a.m., 3:16 a.m., 3:23 a.m., 3:33 a.m., and 4:19 a.m. (*Id.* ¶ 93.) When Sgt. Smith went to check on Marciniak at 4:19 a.m., he discovered that Marciniak had hanged himself in his cell with his t-shirt. (*Id.* ¶ 95.) Sgt. Smith immediately opened the cell, cut Marciniak down, and radioed and yelled for help. (*Id.* ¶ 96.) Within minutes, CPR was performed and NSFD paramedics were providing aid. (*Id.*) Marciniak was transported to the hospital, where he died several days later on August 21, 2016. (*Id.* ¶ 97.)

Two days after Marciniak hanged himself, on August 17, 2016, Officer Andrew Rekuski wrote a report memorializing an interview he conducted of Harper on August 13, 2016. (*Id.* ¶ 103.) Officer Rekuski collected Harper's statement as part of a follow-up investigation into Marciniak's heroin overdose on August 12, 2016. (*Id.* ¶ 104.) Officer Rekuski's report shows that Harper stated that Marciniak had mental illnesses including depression and had attempted suicide in the past. (*Id.* ¶ 106.) Officer Rekuski did not return to work until sometime after 7:30 p.m. on August 15, 2016, when he was called in to assist on the investigation into Marciniak's suicide and another case. (*Id.* ¶ 111.) Officer Rekuski avers that he did not verbally inform anyone of the contents of his interview with Harper before returning to work on the evening of August 15, hours after Marciniak had already hanged himself. (*Id.* ¶ 112.)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

7

law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

The plaintiffs assert eleven causes of action against the defendants under 42 U.S.C. § 1983 and Wisconsin law. To succeed on their § 1983 claims, plaintiffs must prove (1) the deprivation of a right secured by the Constitution or federal law and (2) that defendants

were acting under color of state law. *Wilson v. Warren Cty., Illinois*, 830 F.3d 464, 468 (7th Cir. 2016).

First, plaintiffs allege false arrest claims against the three defendant officers. (Compl., First Cause of Action.) Next, plaintiffs challenge Officer Taraboi's search of Marciniak on the grounds that it lacked reasonable suspicion and was an unlawful strip search. (Causes of Action Two, Three, and Four.)[3] The plaintiffs sue the defendant officers for failing to provide medical care, medical attention, and protect Marciniak from self-harm. (Causes of Action Five, Six, and Seven.) They sue the officers for loss of society and companionship for Marciniak's son. (Eighth Cause of Action.) Finally, the plaintiffs allege the defendants violated Wisconsin law. (Causes of Action Nine, Ten, and Eleven.) Again, the defendants move for summary judgment in their favor as to all of the plaintiffs' claims, while the plaintiffs move for summary judgment in their favor on their false arrest claim. I will address each argument in turn.

### 1. False Arrest Claim

To prevail on a constitutional claim for false arrest, the plaintiffs must show that there was no probable cause for Marciniak's arrest. *See Williams v. City of Chicago*, 733 F.3d 749, 756 (7th Cir. 2013). "Probable cause is an absolute defense to claims of wrongful or false arrest under the Fourth Amendment in section 1983 suits. In other words, if an officer has probable cause to arrest a suspect, the arrest was not false." *Ewell v. Toney*, 853 F.3d 911, 919 (7th Cir. 2017) (internal citation omitted). Thus, the question before me is whether the

---

[3] In the complaint, the plaintiffs bring their causes of action related to the alleged strip search under deprivation of substantive and procedural due process. (Causes of Action Three and Four.) When the defendants pointed out that the strip search claims are properly brought under the Fourth Amendment, not the Fourteenth Amendment (Defs.' Br. in Supp. of Summ. Judg. at 15–16, Docket # 30), the plaintiffs agreed to dismiss their due process claims (Pl.'s Br. in Opp. at 29 n.6, Docket # 57). The plaintiffs continue, however, to argue that Officer Taraboi conducted an unreasonable strip search under the Fourth Amendment. (Pl.'s Br. in Opp. at 31–33.)

officers had probable cause to arrest Marciniak. The plaintiffs argue that the undisputed facts establish that Marciniak was arrested without probable cause, while the defendants argue the converse.

Probable cause exists if "at the time of the arrest, the facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Williams*, 733 F.3d at 756 (internal quotation and citation omitted). Whether probable cause exists is "'a fluid concept that relies on the common-sense judgment of the officers based on the totality of the circumstances.'" *Id.* (quoting *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006)). In making this determination, the Court must "'step[ ] into the shoes of a reasonable person in the position of the officer[,]'" *id.* (quoting *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008)), "considering the facts known to the officer at the time," *id.* (citing *Carmichael v. Village of Palatine*, 605 F.3d 451, 457 (7th Cir. 2010)). In deciding this question of law as part of a motion for summary judgment, I must give the non-moving party the benefit of conflicts in the evidence about what the officers actually knew at the time. *Id.* In this case, however, both parties have moved for summary judgment in their favor on this issue. Thus, "the court must consider the evidence through two different lenses. When considering defendants' motion[ ], the court gives plaintiffs the benefit of conflicts in the evidence and favorable inferences. When considering plaintiffs' motion[ ], defendants receive those benefits." *Lessley v. City of Madison, Ind.*, 654 F. Supp. 2d 877, 890 (S.D. Ind. 2009).

The crux of the plaintiffs' argument is that the defendant officers failed to consider the totality of the circumstances—specifically both inculpatory and exculpatory evidence—

before arresting Marciniak. (Pl.'s Br. in Supp. of Partial Summ. Judg. at 11–12, Docket # 39.) Plaintiffs argue that Sgt. Smith and Officer Taraboi ignored easily discoverable facts that would have exculpated Marciniak, specifically, failing to interview Harper and Tatiana Hoover prior to Marciniak's arrest and failing to view Hoover's cellphone video. (*Id.* at 12.) In effect, the plaintiffs argue that the officers stopped their inquiry into Harper's fall prematurely, because conducting further interviews and viewing the cellphone video would have shown that Marciniak did not, in fact, harm Harper.

But in making a probable cause determination, I am tasked with considering the facts known to the officers at the time of the arrest and determining whether, based on the totality of the circumstances, a reasonable officer would believe that a crime had been or will be committed. The undisputed facts are as follows. At 1:34 a.m. on August 15, 2016, Marciniak and Harper's neighbor called 911 reporting that a man had fallen out of a third or fourth story window. (PPFOF ¶ 5 and Defs.' Resp. ¶ 5.) At 1:35 a.m., a dispatched call was made to SPD instructing officers to respond to the 4400 block of Oakland Avenue "for a male subject that fell out of a fourth story window." (*Id.* ¶ 16.) Two of the defendant officers, Sgt. Smith and Officer Taraboi, arrived at the seen shortly thereafter. (*Id.* ¶ 18.) Sgt. Smith had met Marciniak once, a few weeks prior, at the same location when he responded to a domestic violence incident in progress. (*Id.* ¶ 19.) The SPD officers found a male lying on the ground, later determined to be Harper, who appeared to have fallen from an open window. (*Id.* ¶ 20.) The NSFD arrived shortly thereafter. (*Id.* ¶ 21.)

When Sgt. Smith, Officer Taraboi, and Officer Smith entered the apartment to conduct a welfare check, they learned from a neighbor living across the hall from Marciniak and Harper that the two men were in a relationship and that he previously overheard loud

11

arguments coming from the apartment. (*Id.* ¶ 30.) Officer Smith informed Sgt. Smith and Officer Taraboi that the SPD had responded to the same apartment a few days earlier because Marciniak overdosed on heroin and was taken to either the hospital or the Milwaukee County Mental Health Complex for treatment. (*Id.* ¶ 31.) Upon forcing entry into Marciniak and Harper's apartment after no one responded to loud knocking, the officers found Marciniak naked, lying face down, and unconscious. (*Id.* ¶ 35.) The officers also observed shards of broken glass on the bed, the bed separated from the bed frame, and a broken lamp. (*Id.* ¶ 36.) The officers also saw two broken glasses inside the bedroom and drops of blood on the bed. (*Id.* ¶¶ 41–42.) The officers noticed the inside window screen had been removed from the window out of which Harper fell. (*Id.* ¶ 43.) After Marciniak regained consciousness, he told the officers he had fallen asleep and did not remember being involved in any argument with Harper, though he later denied having fought with Harper. (*Id.* ¶¶ 52, 60.) Marciniak appeared to be intoxicated and asked where Harper was. (*Id.* ¶¶ 54–55.) He seemed confused as to what was going on, and it appeared that Marciniak did not know what happened to Harper. (*Id.* ¶ 61.)

Given the totality of the facts known to the officers at the time of Marciniak's arrest, a reasonable officer would believe that one or more possible crimes had occurred. As plaintiffs acknowledge, under Wisconsin law, domestic abuse includes intentional infliction of physical pain or injury against an adult with whom the person resides or formerly resided. (Pls.' Br. in Supp. of Partial Summ. Judg. at 9–10, citing Wis. Stat. § 968.075.) The officers learned from a neighbor that Harper and Marciniak either presently lived together or previously lived together; the neighbor had previously heard loud arguments coming from their apartment; Harper was found having fallen from a window in which the screen had

12

been removed; the apartment was in disarray, including broken glass and a broken lamp; drops of blood were found on the bed; and the officers had recently responded to the same apartment for a previous domestic violence incident.

Despite being presented with these facts, plaintiffs argue the officers should have investigated further to determine whether there was an innocent explanation for what they observed. (*Id.* at 10.) Plaintiffs argue that Harper's fall "could just as reasonably been an accident," that there is nothing "particularly unusual" about a disheveled bedroom, Marciniak's intoxicated state could plausibly explain the broken glass and general disarray in the room, and the prior domestic disturbance call was "minimally probative since prior behavior alone does not establish reasonable grounds to believe that an individual is presently engaged in criminal conduct." (*Id.* at 10–11.)

The plaintiffs cite *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986) in support of their argument, a case in which the court said that police cannot ignore clarifying facts in determining probable cause. *BeVier*, however, is inapposite. In that case, the court found that more inquiry was needed to determine whether probable cause could even be established. As one court explained, in *BeVier*, "the court said that police can't ignore clarifying facts, but the level of probable cause hadn't been reached at all; more inquiry was needed to establish probable cause, not to negate it." *Keen v. City of Indianapolis by & through Metro. Police Dep't*, No. 1:19-CV-1241 RLM-MPB, 2021 WL 1108704, at *3 (S.D. Ind. Mar. 23, 2021). However, once probable cause has been established, officials have "no constitutional obligation to conduct any further investigation in the hopes of uncovering potentially exculpatory evidence." *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999), *as amended* (Jan. 7, 2000) (internal quotation and citation omitted). And while an officer "may

13

not ignore conclusively established evidence of the existence of an affirmative defense," the officer "has no duty to investigate the validity of any defense." *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1061 (7th Cir. 2004).

The plaintiffs argue that the officers ignored two pieces of potentially exculpatory information. Specifically, Harper testified that while he was lying on the ground and the paramedics were placing him on the gurney, the officers asked him whether Marciniak pushed him out of the window, to which he said no. (Declaration of Joseph M. Wirth ¶ 3, Ex. C, Deposition of Eric Harper at 57, Docket # 43-2.) Harper testified that he "made [it] very clear" when the officers found him that Marciniak did not push him out of the window. (*Id.* at 51.) The plaintiffs further argue that the cellphone video recorded by Tatiana Hoover contains intelligible audio where a male voice can be heard stating "wake your fucking ass up and pull me into the fucking house." (PPFOF ¶ 11.) The same male voice then is heard stating, "Jonah, pull me into the house, Jonah, Jonah." (*Id.* ¶ 12.) At approximately one minute and 20 seconds into the cell phone recording, the same male voice becomes louder as he starts yelling, "help me, help me now, pull me back onto the house, Jonah, Jonah, pull me back into the fucking house, Jonah, Jonah." (*Id.* ¶ 13.) The plaintiffs argue this demonstrates that Marciniak did not push Harper.

Even assuming these facts are true, it does not negate probable cause. Again, the officers were not required to go looking for facts that could potentially negate probable cause, they simply could not ignore conclusively established evidence of a potential defense. The information the plaintiffs cite is far from conclusive evidence that Marciniak did not commit a crime. If anything, the cited facts may exonerate Marciniak from attempted

14

homicide charges (i.e., that Marciniak did not push Harper out of the window), but it does not negate the potential that domestic violence occurred under Wisconsin law.

Because the undisputed facts establish that the officers had probable cause to arrest Marciniak, the plaintiffs' false arrest claim under § 1983 necessarily fails. Also, because I find the claim fails on the merits, I need not address the defendants' qualified immunity defense. (Def.'s Br. in Supp. of Summ. Judg. at 26–27.) As such, the plaintiffs' motion for partial summary judgment is denied and the defendants' motion for summary judgment is granted as to the false arrest claim.

### 2. *Unreasonable Search/Strip Search*

The plaintiffs allege that Officer Taraboi's search of Marciniak incident to his arrest was unreasonable (Pl.'s Br. in Opp. at 29–31) and that Officer Taraboi conducted an unreasonable strip search of Marciniak (*id.* at 31–33). As to the custodial search, the plaintiffs argue that Officer Taraboi's pat down search of Marciniak at the SPD lockup was unreasonable because the officers found Marciniak naked in his bedroom, gave him clothes, watched him dress, transported him to the SPD, and escorted him to the interview room. (*Id.* at 30.) Plaintiffs argue that Officer Taraboi did not need to search Marciniak at the station because "he already knew about everything in [Marciniak's] possession from the time he was found naked until the time of the search." (*Id.*)

Another court in this district considered this question under very similar circumstances. In *Anderson v. City of W. Bend Police Dep't*, 774 F. Supp. 2d 925 (E.D. Wis. 2011), the plaintiff challenged the reasonableness of her custodial search because she was taken into custody and handcuffed with her hands behind her back while she was naked and the officers provided her with the clothes she dressed in. *Id.* at 945. Plaintiff argued that

15

there was no need for officers to search her again once she was fully clothed, as it was "obvious that she did not possess any weapons, contraband, or anything else that could pose a danger to the officers' safety." *Id.* The *Anderson* court acknowledged the "logical force" to plaintiff's argument, noting that "it would appear that, at the time of the search, she was not in a position to either reach for a weapon or destroy evidence." *Id.* The court ultimately rejected the plaintiff's argument, however, finding that the although the authority to search a person incident to a lawful arrest is based upon the need to disarm or discover evidence, it does not necessarily follow that the authority depends upon "what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect." *Id.* (quoting *United States v. Robinson*, 414 U.S. 218, 235 (1973)). The *Anderson* court also cited the Supreme Court's decision in *Robinson*, in which the Court stated that:

> A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a "reasonable" search under that Amendment.

*Id.* (quoting *Robinson*, 414 U.S. at 235). Thus, the court determined that despite the unique circumstances of plaintiff's case, the search was not unreasonable. The court further noted that the plaintiff was allowed briefly out of her handcuffs to put on her top before being re-cuffed and this may have been enough time for her to conceal a weapon. *Id.* at 946.

Marciniak's three to four minute pat-down search at the SPD was even less intrusive than the plaintiff's search in *Anderson*. While the officers found Marciniak naked and handed him clothes found in Marciniak's bedroom, Marciniak dressed himself and was not

16

placed in handcuffs until he was outside of the apartment. Even though the officers were in the room while Marciniak dressed, it was not certain that Marciniak's clothes contained no items that could potentially risk officer safety. Thus, Officer Taraboi's search of Marciniak incident to his arrest did not run afoul of the Fourth Amendment.

The plaintiffs also allege that Officer Taraboi conducted an unreasonable strip search of Marciniak. (Pl.'s Br. in Opp. at 31–33.) The undisputed facts show that when encountering Marciniak without any clothing on, Officer Taraboi gave him clothes and underwear to put on, but Marciniak chose not to put the underwear on. (DPFOF ¶ 35 and Pl.'s Resp. ¶ 35.) Then, while walking from Officer Taraboi's squad car to the interview room, Marciniak's shorts sagged, exposing some of his "private areas." (*Id.* ¶¶ 59–60.) Again, the parties dispute how much of Marciniak's "private areas" the officers observed. The plaintiffs argue that despite the officers' claims that they could not remember whether they saw Marciniak's buttocks or genitals, video evidence shows that Officer Lagerman (a female officer) was looking at Marciniak while his shorts were falling down, exposing his pubic area and pubic hair. (Pl.'s Br. in Opp. at 31–32.) The plaintiffs further argue that video footage from when Marciniak was escorted from the interview room to the jail cells shows that his shorts were falling down, exposing his pubic area, pubic hair, and buttocks to two SPD officers. (*Id.* at 32.)

The plaintiffs argue Officer Taraboi violated Wis. Stat. § 968.255(1)(b), which defines a "strip search" as a search in which a detainee's genitals, pubic area, or buttock is exposed. The statute requires certain conditions be present to conduct a strip search, including the person conducting the search to be of the same sex as the detainee. Wis. Stat. § 968.255(2)(am). But plaintiffs do not bring a violation of Wis. Stat. § 968.255, they bring a

violation of the Fourth Amendment pursuant to § 1983, implicating the reasonableness of the search. "[A] violation of Section § 968.255 does not equate to a Fourth Amendment violation (and vice versa), but the evidence used to prove these claims will obviously overlap." *Laur v. Est. of Gaidish*, No. 14-C-27, 2015 WL 3872244, at *2 (E.D. Wis. June 23, 2015). However, "the Constitution does not require compliance with state law." *Davis-Clair v. Turck*, 714 F. App'x 605, 606 (7th Cir. 2018). A federal court hearing a case under 42 U.S.C. § 1983 decides whether the defendants violated a plaintiff's rights under the federal Constitution—state courts decide whether defendants violated Wisconsin laws. *Kyles v. Charney*, No. 17-CV-1102-PP, 2018 WL 2120914, at *2 (E.D. Wis. May 8, 2018).

In *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 325 (2012), the Supreme Court noted that while the term "strip search" is "imprecise," it indicated that the term generally refers to "the instruction to remove clothing while an officer observes." It is undisputed that when encountering Marciniak naked, Officer Taraboi gave him clothing and underwear to put on, and Marciniak chose not to wear underwear. (DPFOF ¶ 35 and Pl.'s Resp. ¶ 35.) It is also undisputed that Officer Taraboi did not pull Marciniak's shorts down, did not instruct anyone else to pull his shorts down, and did not touch Marciniak's genitals, pubic area, or buttocks at any time. (*Id.* ¶¶ 63–64.) In fact, when Marciniak's shorts began slipping down, Officer Taraboi grabbed the shorts by the waistband and held them up. (*Id.* ¶ 61 and Pls.' Resp. ¶ 61.) Thus, the undisputed evidence shows that Marciniak's shorts slipped down at various points during his interaction with the officers, and the officers, at most, briefly inadvertently viewed some portion of Marciniak's pubic area and buttocks. This does not constitute an unreasonable search. Rather, it is more akin to an "incidental observation[ ] of [an] undressed inmate[ ]," which the court has stated is "almost

18

always reasonable," especially when the observation is "infrequent or at a distance." *Henry v. Hulett*, 969 F.3d 769, 783 (7th Cir. 2020). Thus, I do not find that Officer Taraboi conducted an unreasonable strip search of Marciniak. Again, because I find the claims fail on the merits, I need not address the defendants' qualified immunity defense. (Def.'s Br. in Supp. of Summ. Judg. at 27.) The defendants' motion for summary judgment is granted as to the plaintiffs' claims that Officer Taraboi unreasonably searched Marciniak.

### 3. *Failure to Provide Medical Care/Prevent Self-Harm*

The plaintiffs further allege that the defendants violated Marciniak's rights under § 1983 by failing to prevent self-harm and to provide medical care. (Pls.' Br. in Opp. at 19.) Specifically, plaintiffs allege that Sgt. Smith and Officer Taraboi failed to prevent Marciniak from hanging himself while in lockup at the SPD and that all three defendant officers failed to provide the necessary medical and/or mental health care based on their evolving knowledge of Marciniak's increasing medical needs. (*Id.*)

### 3.1 Legal Standards

"'[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.'" *Estate of Perry v. Wenzel*, 872 F.3d 439, 453 (7th Cir. 2017) (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989)). Because Marciniak was a pretrial detainee, the plaintiffs' causes of action arise under the Fourth Amendment rather than the Eighth Amendment. *See id.* The Seventh Circuit distinguishes between claims concerning a failure to provide medical care, and those pertaining to conditions of confinement, but in each case applies the Fourth Amendment's "objectively unreasonable" standard. *See Currie v. Chhabra*, 728 F.3d 626, 629 (7th Cir.

19

2013). Whether the officers' actions were "objectively unreasonable under the circumstances" is a less demanding standard than the Eighth Amendment's deliberate indifference standard. *Estate of Perry*, 872 F.3d at 453 (internal quotation and citation omitted).

When considering whether the medical care provided comported with the objectively reasonable requirement of the Fourth Amendment, I am guided by four factors: "(1) whether the officer has notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns." *Id.* (internal quotation and citation omitted). In the case of an arrestee's suicide, "'[O]fficers must receive some form of notice of suicide risk before their failure to prevent an arrestee's suicide can be considered objectively unreasonable.'" *Bradford v. City of Chicago*, No. 16 CV 1663, 2021 WL 1208958, at *4 (N.D. Ill. Mar. 31, 2021) (quoting *Buford v. City of Chicago*, 2009 WL 4639747, at *3 (N.D. Ill. Dec. 3, 2009)). This notice can come through word or through observation of the arrestee's physical symptoms. *See Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007).

A failure to prevent self-harm challenges the arrestee's conditions of confinement. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). As with the failure to provide medical care, to succeed on a claim of unconstitutional conditions of confinement, the plaintiff must show that the totality of the officers' conduct in detaining the arrestee was objectively unreasonable under the circumstances. *Flores v. Lackage*, 938 F. Supp. 2d 759, 775 (N.D. Ill. 2013). Relevant factors to consider in assessing the totality of the circumstances are the length of the duration of confinement, the nature and seriousness of the alleged constitutional violation, and the police rationale for the alleged deprivation of the arrestee's

constitutional rights. *Id.* Unlike a Fourth Amendment claim for inadequate medical care, however, a finding of objectively unreasonable conditions of confinement does not require that a defendant have notice of the detainee's medical need. *Saucedo v. City of Chicago*, No. 11 C 5868, 2015 WL 3643417, at *6 (N.D. Ill. June 11, 2015). Rather, such notice is merely one, non-conclusive factor considered amongst several other factors in evaluating whether the totality of the confinement conditions were reasonable. *Id.* But in suicide cases, notice remains instructive because, as the court found in *Alcorn v. City of Chicago*, "it is difficult to see how failure to closely observe [the arrestee] or failure to remove [clothing] items . . . from his person would be 'objectively unreasonable' unless the Defendants were on notice that [he] had a medical condition for which unmonitored time alone or access to [his] own clothing could pose a risk to his safety." 2018 WL 3614010, at *13 (N.D. Ill. July 27, 2018).

### 3.2    Application to This Case

The plaintiffs cite to the same evidence to argue the officers' actions were objectively unreasonable for both their failure to provide medical care and failure to prevent self-harm claims. They argue that Marciniak's mental health condition was apparent at the scene and became increasingly obvious while he was at the jail. (Pl.'s Br. in Opp. at 24.) Specifically, plaintiffs argue that the officers found Marciniak in his apartment non-responsive, intoxicated, and passed out. (Pl.'s Br. in Opp. at 20.) Once he awakened, Marciniak expressed confusion and concern for Harper and appeared upset, possibly crying and in despair. (*Id.* at 20–21.) Plaintiffs argue Marciniak allowed his pants to fall down in front of the officers and ripped his necklace from his neck. (*Id.* at 21.) Plaintiffs further argue the officers were aware that Marciniak recently overdosed on heroin and had prior psychiatric treatment. (*Id.*)

21

Once in the cell, plaintiffs argue that Sgt. Smith observed Marciniak engage in self-harming behavior by banging his body against the cell, and saw that he was upset and anxious. Despite this, plaintiffs argue that neither he nor Officer Taraboi asked Marciniak whether he was suicidal. (*Id.*) Plaintiffs further argue that the officers failed to inquire further into Marciniak's prior psychiatric treatment and failed to make inquires into the SPD's ongoing investigation into Marciniak's prior overdose, in which they would have learned that Marciniak was depressed and suicidal. (*Id.* at 22.)

Plaintiffs' argument that undisputed facts show that the officers' actions were objectively unreasonable under the circumstances is not persuasive. Plaintiffs' argument focuses heavily on how Sgt. Smith and Officer Taraboi either could have or should have discovered Marciniak's suicidal ideation. Again, they argue that had the officers either spoken to Harper or looked into the SPD's ongoing investigation into Marciniak's prior heroin overdose, they would have learned that Marciniak was depressed and suicidal. "Objective reasonableness is not, however, measured by whether an officer *should* have had notice of a medical condition, but whether an officer having *actual* notice of an arrestee's medical condition acted reasonably." *Saucedo v. City of Chicago*, No. 11 C 5868, 2015 WL 3643417, at *4 (N.D. Ill. June 11, 2015) (emphasis in original). The facts known to the officers at the relevant time are as follows: Marciniak appeared intoxicated and/or under the influence of drugs and/or alcohol; Marciniak was upset; Marciniak had a recent heroin overdose; Marciniak had prior psychiatric treatment; and Marciniak was agitated and loud while in the cell, kicking the door, and banging his body.

However, simply being upset, or even having knowledge of diagnosed and medically treated depression, are insufficient to establish notice of suicidality. *See Pulera v. Sarzant*, 966

F.3d 540, 551 (7th Cir. 2020) (arrestee's "scant comments" to defendant officer indicating that his mother and brother had recently committed suicide and that he had been prescribed clonazepam for depression "d[id] not raise an issue of fact" on Fourth Amendment medical care claim); *Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 558 (7th Cir. 2003) ("[N[ot every prisoner who shows signs of depression . . . can or should be put on suicide watch.").

Clearly Marciniak was agitated and upset while in lockup. Sgt. Smith testified that Marciniak was "being loud and kicking the door," so he went to the cell and tried to calm Marciniak down. (Declaration of Ben Elson ¶ 11, Ex. 8, Deposition of Sgt. Cody Smith at 102, 105, Docket # 59-8.) Sgt. Smith testified that he could hear Marciniak banging his body, specifically what he believed to be his foot, and stating that he wanted to go home. (*Id.* at 105–06.) But Marciniak kicking the cell is not the type of self-harm that would have put the officers on notice that Marciniak was contemplating suicide. Furthermore, the officers indisputably checked on Marciniak five times between 2:54 a.m. and 3:33 a.m. It was less than an hour later, at 4:19 a.m., that the officers found Marciniak had hanged himself. The officers knew, at the relevant time period, that Marciniak was intoxicated and upset and had a history of psychiatric care and drug abuse. However, the officers addressed the situation by attempting to calm Marciniak down and frequently checking on him. The record evidence fails to show that the officers had any knowledge of Marciniak's suicidal ideation. Thus, a reasonable jury could not find that the officers' actions were objectively unreasonable. Because I find the claims fail on the merits, I need not address the defendants' qualified immunity defense. (Def.'s Br. in Supp. of Summ. Judg. at 27–28.) Summary judgment is granted in favor of the defendants on plaintiffs' failure to provide medical care and failure to prevent self-harm claims.

### 4. Loss of Society and Companionship

Plaintiffs allege a cause of action under § 1983 for Marciniak's minor son's loss of society and companionship of his father. (Compl., Cause of Action Eight.) While the Seventh Circuit has yet to consider whether minor children have standing to bring claims under § 1983 for loss of society or companionship of a parent, *Est. of Fiebrink by Cade v. Armor Corr. Health Servs., Inc.*, No. 18-CV-832, 2019 WL 1980625, at *11 (E.D. Wis. May 3, 2019), courts in this district have allowed such claims to go forward in the face of a constitutional violation, *see id.*; *see also Avery v. City of Milwaukee*, No. 11-C-408, 2015 WL 13016242, at *1 (E.D. Wis. May 19, 2015). However, because I conclude that the defendants did not violate Marciniak's civil rights, the plaintiffs' loss of society and companionship claim on behalf of Marciniak's minor son necessarily fails. *See Est. of Fiebrink*, 2019 WL 1980625 at *11 ("[I]f a jury finds that [defendant] violated [plaintiff's] civil rights, then this Court will permit the jury to hear [his minor son's] claim.").

### 5. Remaining State Law Claims

The plaintiffs' remaining claims arise under Wisconsin law. (Compl., Causes of Action Nine, Ten, and Eleven.) I will follow the general rule by relinquishing jurisdiction over the supplemental state law claims. *See Redwood v. Dobson*, 476 F.3d 462, 467 (7th Cir. 2007) ("A court that resolves all federal claims before trial normally should dismiss supplemental claims without prejudice."). Thus, the plaintiffs' state law claims are dismissed without prejudice.

## CONCLUSION

Jonah Marciniak's death is indisputably tragic, and nothing in this decision is intended to minimize the tragic loss of his life. However, on the undisputed facts in this

record, I find that no rational trier of fact could find in the plaintiffs' favor as to their 42 U.S.C. § 1983 claims against the defendant officers. Thus, summary judgment is entered in favor of the defendants and against the plaintiffs. I will relinquish jurisdiction over the supplemental state law claims and dismiss them without prejudice.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the defendants' motion for summary judgment (Docket # 29) is **GRANTED**.

**IT IS FURTHER ORDERED** that the plaintiffs' motion for partial summary judgment (Docket # 38) is **DENIED**.

The plaintiffs' federal claims (Causes of Action One through Eight) are dismissed with prejudice. Plaintiffs' state law claims (Causes of Action Nine through Eleven) are dismissed without prejudice.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Strike (Docket # 69) is **MOOT**.

**IT IS FURTHER ORDERED** that the clerk of court will enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 11th day of June, 2021.

BY THE COURT:

NANCY JOSEPH
United States Magistrate Judge

25